ROBERT A. PINEL, ESQ –RP9070
FLAMM, BOROFF & BACINE, P.C.
Westfield Corporate Center, Suite 310
4905 W. Tilghman St.
Allentown, PA 18104
610-336-6800
Attorneys for Plaintiff Credit-Based
Asset Servicing and Securitization, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE KAPLAN

**08 CV 7443**
Civ. No.

| | |
|---|---|
| CREDIT-BASED ASSET SERVICING AND SECURITIZATION, LLC<br><br>              Plaintiff,<br><br>       -against-<br><br>GATEWAY DIVERSIFIED MORTGAGE SERVICES, L.P.<br>             Defendant. | |

**COMPLAINT**

Plaintiff Credit-Based Asset Servicing and Securitization, LLC ("C-BASS" or "Plaintiff"), by its attorneys, Flamm, Boroff & Bacine, P.C., for its complaint against defendant Gateway Diversified Mortgage Services, L.P. ("Defendant") (collectively, the "Parties") alleges as follows:

**PRELIMINARY STATEMENT**

1.     This case involves the failure of Defendant to comply with contractual obligations owed to Plaintiff to repurchase mortgage loans. Plaintiff purchased mortgage loans from Defendant. In certain circumstances, Defendant was required to repurchase certain of the mortgage loans. When Plaintiff requested that Defendant repurchase certain of the mortgage loans, Defendant failed and refused to do so.

2.     Defendant failed to repurchase mortgage loans and/or to indemnify for losses sustained on such mortgage loans totaling $1,098,962.00.  Exhibit 1 lists the mortgage loans that Defendant failed and refused to repurchase.

3.     C-Bass seeks damages of not less than $1,092,184.00.  It also seeks interest, attorney's fees, costs and other damages caused by Defendant's failure to comply with its obligations under the Parties' Agreements.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

5.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) and (2).

## THE PARTIES

6.     Plaintiff C-BASS is a limited liability company organized and existing under the laws of the State of Delaware.  C-BASS maintains its principal place of business at 335 Madison Avenue, New York, New York.

7.     Upon information and belief, Defendant is a limited partnership organized and existing under the laws of the State of Pennsylvania, and maintains its principal place of business at 300 Welsh Road Drive, Building 5, Horsham, Pennsylvania 19044.

## FACTUAL ALLEGATIONS

**The Master Mortgage Loan Purchase Agreement**
**and Related Term Sheet Agreements**

8.     On or about March 1, 2005, C-BASS and Defendant entered into a Master Mortgage Loan Purchase Agreement (the "Purchase Agreement").  (A copy of the

Purchase Agreement is attached hereto as Exhibit 2. Exhibit 2 is hereby incorporated herein as if fully set forth.)

9.      In connection with individual transactions between the Parties pursuant to the Purchase Agreement, C-BASS and Defendant also entered into Term Sheet[1] agreements dated July 8, 2005, March 24, 2006 and January 11, 2007, (collectively, the "Term Sheet Agreements," and together with the Purchase Agreement, the "Agreements"). (Copies of the Term Sheet Agreements are attached hereto as Exhibits 3, 4 and 5. They are incorporated herein as if fully set forth.)

10.      As set forth in Section 16 of the Purchase Agreement, the Parties agreed that the Agreements "shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, excluding conflict of laws issues. . . ."

11.      As is also set forth in Section 16 of the Purchase Agreement, the Parties agreed that all disputes arising under the Agreements shall be submitted to, and the Parties subject themselves to, the jurisdiction of the courts of competent jurisdiction, state and federal, in the State of New York.

**Defendant's Failure to Repurchase**
**Loans With Early Payment Defaults From C-BASS**

12.      Pursuant to the Agreements, Defendant from time to time offered to sell and C-BASS agreed to purchase certain mortgage loans ("Mortgage Loans") in accordance with the terms of the Agreements.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreements.

FBB – 277938v4                                      3

13.    Pursuant to Section 5(f) of the Purchase Agreement, Defendant agreed to repurchase any Mortgage Loan for which the first or second scheduled monthly payment due following the Closing Date for such Mortgage Loan was not received by C-BASS'S servicer or the prior servicer by the last day of the month when such payment was due (hereafter "Early Payment Defaults").

14.    Certain of the Mortgage Loans experienced Early Payment Defaults (hereafter, such Mortgage Loans shall be collectively referred to as "Early Payment Default Loans"). (Exhibit 2 lists, among other things, the Early Payment Default Loans.) Accordingly, pursuant to Section 5(f) of the Purchase Agreement, Defendant is obligated to repurchase each Early Payment Default Loan and remit to C-BASS the Repurchase Price (as defined in the Agreements) with respect to each Early Payment Default Loan.

15.    In addition, for any Early Payment Default Loan which has liquidated or been written off, the Defendant is obligated under Section 19 of the Purchase Agreement to  indemnify C-BASS for any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other costs, fees and expenses that C-BASS may sustain resulting from defendant's breach of a representation, warranty or covenant contained within the Agreements including its failure to repurchase any Early Payment Default Loans.

16.    On July 5, 2007, C-BASS issued a written demand to Defendant to repurchase the Early Payment Default Loans for a sum equal to the Repurchase Price (the "Demand Letter").

FBB – 277938v4                                     4

17.    To date, Defendant has failed to repurchase the Early Payment Default Loans from C-BASS or to indemnify it for losses sustained on such mortgage loans, notwithstanding Defendant's clear contractual obligation to do so.

18.    The aggregate Repurchase Price for the Early Payment Default Loans (including the loss amount for any liquidated or written off Early Payment Default Loan), excluding attorneys' fees and other costs and expenses and certain accrued interest, and netting out any proceeds from liquidation of the mortgage loan or application of any hold back amounts exceeds $758,552.00 as of July 31, 2008.

19.    C-BASS has performed all of its obligations under the Agreements with respect to the Early Payment Default Loans.

20.    As a result of Defendant's failure to repurchase the Early Payment Default Loans, C-BASS may be exposed to any claims or losses that might be sustained by reason of ownership of each such loan.

**Defendant's Failure to Repurchase**
**Loan Misrepresented at Origin**

21.    Pursuant to Section 5(b)(xii) of the Purchase Agreement, Defendant represented that "[t]here has been no error, omission, fraud, dishonesty, misrepresentation, negligence or similar occurrence on the part of any person, including without limitation the mortgagor, any appraiser, any builder or developer, or any other party in connection with the solicitation of the Mortgage Loan...." and pursuant to Section (xxxv) of the Purchase Agreement Defendant represented that "[t]he Mortgage Loan was underwritten in accordance with the underwriting standards of seller in effect at the time Mortgage Loan was originated...."

22.    Pursuant to Section 5(e) of the Purchase Agreement, upon discovery by either Seller or Purchaser of a breach of any of the representations and warranties set forth in Section 5 which adversely affects the value of the Mortgage Loans or the interest of Purchaser (or which adversely affects the interests of the Purchaser in a particular Mortgage Loan), the party discovering such a breach shall give prompt notice of any such breach of a representation or warranty, and within sixty (60) days of such notice, Seller shall cure such breach in all material respects, or, at the option of the Purchaser, repurchase the Mortgage Loan at the Repurchase Price.

23.    One particular Mortgage Loan, Litton loan number xxxx5375 (hereafter, "5375 Loan" and collectively with the Early Payment Default Loans the "Repurchase Loans"), breached, among others, Sections 5(b)(xii) and (xxxv) of the Purchase Agreement.

24.    Pursuant to a C-BASS credit surveillance review (the "Loan Review"), the 5375 Loan was subject to income misrepresentation and failure of the Defendant to abide by its own standards in verifying the borrower's self-employment.

25.    Pursuant to Section 5(e) of the Purchase Agreement, C-BASS issued a Notice of Claim to Defendant, notifying Defendant of the 5375 Loan misrepresentation and demanding Defendant repurchase of the 5375 Loan.

26.    Accordingly, pursuant to Section 5(e) of the Purchase Agreement, Defendant is obligated to repurchase the 5375 Loan and remit to C-BASS the Repurchase Price with respect to the 5375 Loan.

27.    To date, Defendant has failed to repurchase the 5375 Loan, notwithstanding its clear contractual obligation to do so.

28.    The aggregate Repurchase Price for the 5375 Loan, excluding attorneys' fees and other costs and expenses exceeds $340,410.86 as of July 31, 2008.

29.    C-BASS has performed all of its obligations under the Agreements with respect to the 5375 Loan.

30.    As a result of Defendant's failure to repurchase the 5375 Loan, C-BASS may be exposed to any claims or losses that might be sustained by reason of ownership of the 5375 Loan.

**Indemnification and Attorney's Fees and Costs**

31.    Defendant is liable for C-BASS's attorney's fees and expenses incurred in connection with the Repurchase Loans and this lawsuit because:

A.    Pursuant to Sections 5(e) and 5(f) of the Purchase Agreement, the Repurchase Loans shall be repurchased at the "Repurchase Price" which includes, among other things attorneys fees and expenses incurred by Purchaser in connection with any enforcement procedures or otherwise with respect to the Mortgage Loans; and

B.    Pursuant to Section 19 of the Purchase Agreement, Defendant agreed to indemnify C-BASS for any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other costs, fees and expenses that C-BASS may sustain resulting from Defendant's breach of a representation, warranty or covenant contained within the Agreements.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract - Agreements)

32.    Plaintiff C-BASS realleges paragraphs 1 through 31 of this complaint as if fully set forth herein.

33.    Under the Agreements, Defendant agreed to repurchase the Repurchase Loans from C-BASS or indemnify C-BASS for any loss sustained by C-BASS for any failure of Defendant to repurchase the Repurchase Loans.

34.    C-BASS has demanded that Defendant repurchase the Repurchase Loans.

35.    Defendant has refused and failed to repurchase the Repurchase Loans or reimburse C-BASS for any related damages and losses related to the Repurchase Loans.

36.    As a direct, proximate and actual result of Defendant's breach of its obligations to repurchase the Repurchase Loans or reimburse C-BASS for any related damages and losses related to the Repurchase Loans, C-BASS has suffered damages in an amount to be determined at trial, but which is not less than $1,098,962.00 as of July 31, 2008, plus interest.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

37.    Plaintiff C-BASS realleges paragraphs 1 through 36 of this complaint as if fully set forth herein.

38.    In consideration of the sale of the Repurchase Loans, Defendant received payment from C-BASS.

FBB – 277938v4                                8

39.    Defendant has wrongfully refused to repurchase the Repurchase Loans, causing C-BASS to lose the use of those moneys due and owing, and requiring C-BASS to incur attorney's fees to recover these costs due under the Agreements.  It would be unjust and inequitable to allow Defendant to benefit in this manner.

40.    By reason of the foregoing, Defendant has been unjustly enriched at the expense of C-BASS, and C-BASS has suffered damages in an amount to be established at trial.

### THIRD CLAIM FOR RELIEF
### (Indemnification for Legal Fees and Related Costs)

41.    Plaintiff C-BASS realleges paragraphs 1 through 40 of this complaint as if fully set forth herein.

42.    Pursuant to Section 19 of the Purchase Agreement, Defendant agreed to indemnify C-BASS for any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that C-BASS may sustain that are in any way related to Defendant's breach of Defendant's representations, warranties or covenants in strict compliance with the terms of the Purchase Agreement.

43.    Defendant has breached its representations and warranties and failed to observe its covenants, causing C-BASS to suffer the damages for which Defendant owes indemnity.

44.    Pursuant to Sections 5(e) and 5(f) of the Purchase Agreement, the Repurchase Loans shall be repurchased at the "Repurchase Price" which includes,

among other things attorney's fees and expenses incurred by Purchaser in connection with any enforcement proceedings or otherwise with respect to the Mortgage Loans.

45.    Defendant is therefore liable to C-BASS for all of C-BASS's legal fees and related costs, and all other costs, fees and expenses that C-BASS has incurred, is incurring and will incur in connection with Defendant's failure to observe and perform its obligation to repurchase the Repurchase Loans.

## FOURTH CLAIM FOR RELIEF
### (Specific Performance)

46.    Plaintiff C-BASS realleges paragraphs 1 through 45 of this complaint as if fully set forth herein.

47.    The Agreements are valid, enforceable contracts between Defendant and C-BASS.

48.    Under the terms of the Agreements, C-BASS and Defendant made several valid and enforceable mutual agreements.

49.    C-BASS substantially performed its obligations under the Agreements by, *inter alia,* purchasing Repurchase Loans from Defendant pursuant to the terms and provisions of the Agreements.

50.    With respect to the two Repurchase Loans which have not been liquidated or written off, C-BASS is willing and able to perform its obligations under the Agreements by, including but not limited to, delivering repurchased such Repurchase Loans to Defendant.

FBB – 277938v4                              10

51.    Upon information and belief, Defendant is able to continue to perform under the Agreements, including but not limited to, repurchasing those Repurchase Loans.

52.    C-BASS has suffered harm resulting from Defendant's refusal to repurchase those Repurchase Loans for which there is no adequate remedy at law.

53.    C-BASS has demanded, and is entitled to, specific performance of Defendant's repurchase obligations under the Agreements.

54.    As a result of the foregoing breaches, pursuant to the Agreements, Defendant is obligated to pay C-BASS an amount not less than $115,002.00 as of July 31, 2008, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff C-BASS respectfully requests judgment against Defendant as follows:

A.    Damages in an amount to be determined at trial but not less than $1,092,184;

B.    Specific performance of the Agreements;

C.    Attorney's fees and related costs, and all other costs, fees and expenses that C-BASS has incurred, is incurring and will incur in this action in connection with Defendant's failure to observe and perform its obligations under the Agreements; and

D.    Such other and further relief as the Court may deem just and proper at law

or equity.

Dated:  Allentown, Pennsylvania
August  15, 2008


                                        FLAMM, BOROFF & BACINE, P.C.


                              By:    _____
                                        Robert A. Pinel
                                        *Attorneys for Credit-Based Asset Servicing
                                        and Securitization, LLC*

# EXHIBIT 1

Case 1:08-cv-07443-LA... Document 1-2 ...d 08/2...08 ... Page 2 of ...

07/28/08

GATEWAY FUNDING

| DATE NOTICE ONLY SENT | DATE REPURCHASE SUBMITTED | DATE CLAIM SUBMITTED | PREV LOAN NUMBER | LITTON LOAN NO | REPURCHASE ISSUE | UPB @ ACQ | PRICE % | PROCEEDS | ACCRUED INT PAID @ ACQ | UPB @ LIQUIDATION | NOTE RATE | INT PD TO DATE @ LIQUIDATION | ADDL NO OF ACCRUED INT DAYS THRU DUE 07.28.08 / LIQUIDATION | ADDL ACCRUED INT DUE THRU 07.28.07 / LIQUIDATION | ESCROW ADVANCES | CORPORATE ADVANCES | PRIN PMTS RECD | TOTAL REPURCHASE PRICE | LESS REO PROCEEDS | MAKE WHOLE FUNDS DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/10/2007 | 9/2/2007 | | 3239 | 3742 | EARLY PAYMENT DEFAULT | 58,042.30 | 97.188% | 56,430.74 | 833.20 | 58,541.53 | 13.375% | 07/01/07 | 30 | 1,360.21 | | | (453.95) | | | |
| 3/15/2007 | 5/4/2007 | | 60N | 3742 | EARLY PAYMENT DEFAULT | 54,380.71 | 97.188% | 54,524.78 | 787.86 | 58,561.76 | 13.375% | 04/01/07 | 120 | 1,501.94 | | | (148.55) | | | |
| | | | | | | | | | | | | | | | | | | 115,955.31 | | 90,148.31 |
| 3/7/2007 | 5/4/2007 | | 10005 | 4273 | EARLY PAYMENT DEFAULT | 730,000.00 | 101.03% | 190,182.80 | 7,226.27 | 195,246.18 | 9.875% | 07/30/07 | 360 | 22,425.14 | 2,356.60 | | (252.60) | | | |
| 3/7/2007 | 5/4/2007 | | 8 | 4091 | EARLY PAYMENT DEFAULT | 195,000.00 | 101.03% | 196,182.80 | 1,712.28 | 195,245.18 | 9.875% | 07/30/07 | 360 | 19,945.66 | 0.00 | | (91.40) | | | |
| 3/7/2007 | 5/4/2007 | | 10492 | 3865 | EARLY PAYMENT DEFAULT | 67,209.33 | 97.188% | 65,699.72 | 2,109.00 | 65,182.40 | 13.375% | 11/25/07 | 329 | 250,008.70 | | | 250,008.70 | | | |
| 3/7/2007 | 5/4/2007 | | | | EARLY PAYMENT DEFAULT | 67,209.33 | 97.188% | 65,699.72 | 866.30 | 67,773.03 | 11.375% | 09/25/07 | 320 | 5,002.87 | 386.00 | | (191.94) | 73,068.80 | 73,068.80 | |
| | | | | | | | | | | | | | | | | | | 697,838.70 | | 681,838.70 |

MAKE WHOLE

| DATE NOTICE ONLY SENT | DATE REPURCHASE SUBMITTED | DATE CLAIM SUBMITTED | PREV LOAN NUMBER | LITTON LOAN NO | REPURCHASE ISSUE | UPB @ ACQ | PRICE % | PROCEEDS | ACCRUED INT PAID @ ACQ | UPB @ LIQUIDATION | NOTE RATE | INT PD TO DATE @ LIQUIDATION | ADDL NO OF ACCRUED INT DAYS THRU DUE 07.28.08 / LIQUIDATION | ADDL ACCRUED INT DUE THRU 07.28.07 / LIQUIDATION | ESCROW ADVANCES | CORPORATE ADVANCES | PRIN PMTS RECD | TOTAL REPURCHASE PRICE | LESS REO PROCEEDS | MAKE WHOLE PAYMENT | MAKE WHOLE FUNDS DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | |

WIRE INSTRUCTIONS:
JPMorgan Chase Bank - Texas
Credit: CLASS Settlement Account
ABA # 021 000 021
Acct/# 113 420724
Attn: Contract Claims (GAY)

| DATE NOTICE ONLY SENT | DATE REPURCHASE SUBMITTED | DATE CLAIM SUBMITTED | PREV LOAN NUMBER | LITTON LOAN NO | REPURCHASE ISSUE | UPB @ ACQ | PRICE % | PROCEEDS | ACCRUED INT PAID @ ACQ | UPB @ LIQUIDATION | NOTE RATE | INT PD TO DATE @ LIQUIDATION | ADDL NO OF ACCRUED INT DAYS THRU 07.28.08 | ADDL ACCRUED INT DUE THRU 07.28.07 | ESCROW ADVANCES | CORPORATE ADVANCES | TOTAL REPURCHASE PRICE | LESS REO PROCEEDS | MAKE WHOLE PAYMENT | MAKE WHOLE FUNDS DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/24/2007 | | | 4155 | 3375 | NSREP AT ORIGINATION | 274,783.13 | 98.250% | 266,492.94 | 1,774.14 | 273,651.10 | 10.125% | 08/01/08 | 730 | 53,540.21 | 7,861.17 | 12,063.23 | (238.34) | 344,851.01 | 144,351.01 | 50,000.00 | 64,616.04 |
| | | | | | | | | | | | | | | | | | | 344,418.96 | | | |
| | | | | | | | | | | | | | | | | | | 340,418.96 | | | |

NEGOTIATED SETTLEMENT AMOUNT $226,000.00

# EXHIBIT 2

MASTER ASSET PURCHASE AGREEMENT

between

GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, LP
Seller

and

CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC
Purchaser

Federal Housing Administration-Insured and

Department of Veterans Affairs-Guaranteed

Residential Fixed and Adjustable Rate

First or Second Lien Mortgage Loans

and REO Properties

Dated as of March 1, 2005

## TABLE OF CONTENTS

Page

SECTION 1.    Agreement to Purchase................................................................1

SECTION 2.    Asset Schedule ......................................................................1

SECTION 3.    Purchase Price; Payments...........................................................1

SECTION 4.    Closing .................................................................................2

SECTION 5.    Representations, Warranties and Covenants of Seller. .............................3

SECTION 6.    Closing Documents ................................................................18

SECTION 7.    Costs ..................................................................................19

SECTION 8.    Servicing...............................................................................20

SECTION 9.    Hazard Insurance ..................................................................24

SECTION 10.    No Solicitation.......................................................................24

SECTION 11.    Confidentiality.......................................................................24

SECTION 12.    Survival of Agreement ............................................................24

SECTION 13.    Notices................................................................................25

SECTION 14.    Severability Clause.................................................................25

SECTION 15.    Counterparts.........................................................................25

SECTION 16.    Place of Delivery and Governing Law..........................................25

SECTION 17.    Further Assurances.................................................................25

SECTION 18.    Successors and Assigns; Assignment............................................25

SECTION 19.    Indemnification......................................................................26

SECTION 20.    Amendments.........................................................................26

SECTION 21.    Interpretation .......................................................................26

SECTION 22.    Intention of the Parties ...........................................................26

SECTION 23.    Reproduction of Documents.......................................................26

SECTION 24.    Exhibits...............................................................................27

SECTION 25.    Bid Letter............................................................................27

[TPW: NYLEGAL:11558.20] 17999-00000  01/14/2005 01:50 PM

<u>EXHIBITS</u>

EXHIBIT A-1          Contents of Asset File

EXHIBIT A-2          Contents of Servicing File

EXHIBIT B          Form of Term Sheet

    SCHEDULE ONE          Asset Schedule

    SCHEDULE TWO          Purchase Price Schedule

    SCHEDULE THREE     Document Deficiency Schedule

    SCHEDULE FOUR          Mortgage Loans without Tax Service Contracts

EXHIBIT C          Form of Security Release Certification

EXHIBIT D          Form of Bill of Sale

EXHIBIT E          Form of Affidavit and Assignment of Claim

EXHIBIT F          Form of Bailee Letter Agreement

EXHIBIT G          Servicing Transfer Instructions

EXHIBIT H          Form of Seller's Officer's Certificate

ADDENDUM

ADDENDUM 1          REO Properties

ADDENDUM 2          FHA and VA Mortgage Loans

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

## MASTER ASSET PURCHASE AGREEMENT

This Master Asset Purchase Agreement (the "Agreement") is entered into as of March !, 2005 by and between Gateway Funding Diversified Mortgage Services, LP, a Pennsylvania limited partnership having an office at 300 Welsh Road Drive, Building 5, Horsham, Pennsylvania 19044 ("Seller") and Credit-Based Asset Servicing and Securitization LLC, a Delaware limited liability company having an office at 335 Madison Avenue - 19th Floor, New York, New York 10017 ("Purchaser").

Seller desires to sell, from time to time, to Purchaser, and Purchaser desires to purchase, from time to time, from Seller on various dates specified in the related Term Sheet or such other dates as Purchaser and Seller mutually agree (each, a "Closing Date") and on terms and conditions described below, certain residential fixed and adjustable rate first or second lien mortgage loans (the "Mortgage Loans") , and one-to-four family, residential real properties which have been acquired by Seller by foreclosure or similar proceedings (the "REO Properties") collectively with the Mortgage Loans, the "Assets"). The Assets shall be sold to Purchaser on a servicing released basis.

Certain of the Mortgage Loans may be insured by the Federal Housing Administration or guaranteed in part by the Department of Veterans Affairs and were purchased by Seller from a trust established by the Government National Mortgage Association due to the delinquency status of such Mortgage Loans as of the date of such purchase (the "FHA and VA Mortgage Loans"). Certain additional terms and conditions with respect to the REO Properties are attached hereto as Addendum 1. Certain additional terms and conditions with respect to the FHA and VA Mortgage Loans are attached hereto as Addendum 2.

Seller and Purchaser, in consideration of the premises and the mutual agreements set forth herein and other good and valuable consideration, agree as follows:

SECTION 1. Agreement to Purchase. Seller hereby agrees to sell, and Purchaser hereby agrees to purchase, from time to time, on the terms and conditions stated herein and in the related Term Sheet executed by Purchaser and Seller in the form attached hereto as Exhibit B (the "Term Sheet") certain Assets having an aggregate principal balance as of the date set forth as the Cut-off Date as specified on the related Term Sheet (such principal balance, the "Cut-off Date Principal Balance").

SECTION 2. Asset Schedule. Seller and Purchaser hereby agree that the Assets to be purchased under this Agreement on a particular Closing Date will be described in the schedule (the "Asset Schedule") to be attached as Schedule One to the related Term Sheet.

SECTION 3. Purchase Price; Payments.

(a)    On the related Closing Date, the purchase price for the Assets (the "Purchase Price") shall be an amount equal to (i) the amount specified on Schedule Two attached to the related Term Sheet plus (ii) with respect to any Mortgage Loans which are less than 60 days delinquent as of the related Cut-off Date (as identified on the related Term Sheet), accrued and unpaid interest to the day prior to the related Closing Date; provided that, Purchaser shall not pay more than 60 days interest with respect to any Mortgage Loan. Purchaser and Seller further

-1-

agree that the Purchase Price shall be reduced by an amount equal to $50.00 per Mortgage Loan as set forth on Schedule Four attached to the related Term Sheet to compensate Purchaser for the cost of acquiring a tax service contract for each such Mortgage Loan. Seller, simultaneously with the payment of the Purchase Price, shall execute and deliver to Purchaser a Bill of Sale (as hereinafter defined) with respect to the related Mortgage Loans in the form attached hereto as Exhibit D.

(b)    On the related Transfer Date, Seller shall remit to Purchaser to the account designated in writing by Purchaser with respect to the related Mortgage Loans the positive escrow account balances maintained for the mortgagors and any suspense funds and all other similar amounts held by Seller. Any payments required to be made by Seller pursuant to this Section 3(b) shall be made by wire transfer of immediately available funds. With respect to any Mortgage Loans which are 60 or more days delinquent as of the related Cut-off Date (as identified on the related Term Sheet), Purchaser shall not purchase any corporate or escrow advances as described in Sections 8(d) and (e) herein. With respect to any Mortgage Loans which are less than 60 days delinquent as of the related Cut-off Date (as identified on the related Term Sheet) and subject to the immediately succeeding sentence, Purchaser shall purchase the corporate and escrow advances for which Seller has provided the documentation related to such advances as described in Sections 8(d) and (e) herein and that are determined by Purchaser to be recoverable. Purchaser shall reimburse Seller for such advances within thirty (30) days of receipt of the documentation related to the advances.

(c)    Purchaser shall be entitled to all payments of principal and interest and other recoveries on the Assets received after the related Cut-off Date, which at Purchaser's option shall be either (i) applied to the Purchase Price on the related Closing Date, or (ii) paid to Purchaser on the related Transfer Date. Purchaser shall not reimburse the Seller for any costs or expenses incurred by Seller with respect to the servicer of the Mortgage Loan assessing the mortgagor any delinquent payment fees that are not specifically permitted in the Mortgage or Mortgage Note, including but not limited to demand letter charges, or assessing the mortgagor interest on any advances made by the servicer of the Mortgage Loan.

SECTION 4.  Closing. The closing of the purchase and sale of the Assets identified on the Asset Schedule accepted by Purchaser in accordance with the procedures set forth herein shall take place on the related Closing Date. Seller shall provide Purchaser with the proposed Asset Schedule at least one (1) business day prior to the related Closing Date, and Purchaser shall have the right to accept or reject the Assets on the proposed Asset Schedule.

The obligation of Purchaser to purchase the Assets on the related Closing Date as contemplated by this Agreement shall be subject to each of the following conditions:

(a)    all of the representations and warranties under this Agreement and the related Term Sheet shall be true and correct as of the related Closing Date, and no default or event which, with the giving of notice or the passage of time or both, would constitute an event of default under this Agreement and the related Term Sheet shall have occurred;

(b)    Purchaser shall have received executed copies of the closing documents specified in Section 6 of this Agreement;

-2-

(c)    Seller shall have made available for Purchaser's inspection at least five (5) business days prior to the related Closing Date, at the office of The Bank of New York, Purchaser's custodian, under a Bailee Letter Agreement (the "Bailee Letter Agreement") in the form attached hereto as Exhibit F, the contents of the Asset File as described in Exhibit A-1 and shall deliver to Purchaser, or its designee the Servicing File as described in Exhibit A-2 for the related Assets in accordance with Section 8(c) of this Agreement; and

(d)    all other terms and conditions of this Agreement and the related Term Sheet shall have been complied with.

Subject to the foregoing conditions, Purchaser shall pay to Seller on the related Closing Date the related Purchase Price as determined pursuant to Section 3 of this Agreement, by wire transfer of immediately available funds to the account designated in writing by Seller. Seller shall advise Purchaser in writing at least one (1) business day prior to the related Closing Date of the account to which such funds are to be wired.

In addition, in connection with the assignment of any MERS Loan (as defined herein), Seller agrees that on or prior to each Closing Date it will cause, at its own expense, the MERS System (as defined herein) to indicate that the related Mortgage Loans have been assigned by Seller to Purchaser in accordance with this Agreement by including in such computer files the information required by the MERS System to identify Purchaser as owner of such Mortgage Loans.

SECTION 5. Representations, Warranties and Covenants of Seller.

(a)    Seller represents and warrants to, and covenants with, Purchaser that as of each Closing Date:

    (i)    It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all licenses necessary to carry on its business as now being conducted. It is licensed in, qualified to transact business in and is in good standing under the laws of the state in which any Mortgaged Property (as defined herein) or any REO Property is located except where the failure to be so licensed and qualified would not have a material adverse effect on its business or operations. No licenses or approvals obtained by Seller have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

    (ii)    It has the full power and authority (corporate and other) to hold each Asset, to sell each Asset and to execute, deliver and perform, and to enter into and consummate all transactions contemplated by this Agreement and the related Term Sheet. Seller has duly authorized the execution, delivery and performance of this Agreement and the related Term Sheet, has duly executed and delivered this Agreement and the related Term Sheet, and this Agreement and the related Term Sheet constitute legal, valid and

-3-

binding obligations of it, enforceable against it in accordance with their terms, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance;

(iii)    Neither the execution and delivery of this Agreement and the related Term Sheet and the other documents and agreements contemplated hereby, the consummation of the transactions contemplated hereby and thereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement and the related Term Sheet and such other documents and agreements will result in the breach of any term or provision of the charter or by-laws of Seller or result in the breach of any material term or provision of, or conflict with or constitute a default under or result in the acceleration of any obligation under, any material agreement, indenture or loan or credit agreement or other instrument to which Seller or its property is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which Seller or its property is subject;

(iv)    It does not believe that it cannot perform each and every covenant contained in this Agreement and the related Term Sheet;

(v)    There are no actions, suits or proceedings pending or, to its knowledge, threatened or likely to be asserted against or affecting it, before or by any court, administrative agency, arbitrator or governmental body with respect to any of the transactions contemplated by this Agreement and the related Term Sheet or any other matter which may materially and adversely affect its ability to perform its obligations under this Agreement or the related Term Sheet or which may materially and adversely affect its business or prospects;

(vi)    With respect to Seller, the consummation of the transactions contemplated by this Agreement and the related Term Sheet are in the ordinary course of its business and the transfer, assignment and conveyance of the Assets are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(vii)    The transfer of the Assets shall be treated as a sale on the books and records of Seller, and Seller has determined that, and will treat, the disposition of the Assets pursuant to this Agreement for tax and accounting purposes as a sale.  Seller shall maintain a complete set of books and records for each Asset which shall be clearly marked to reflect the ownership of each Asset by Purchaser;

(viii)    The consideration received by Seller upon the sale of the Assets constitutes fair consideration and reasonably equivalent value for such Assets;

-4-

(ix)    Seller is solvent and will not be rendered insolvent by the consummation of the transactions contemplated hereby. Seller is not transferring any Asset with any intent to hinder, delay or defraud any of its creditors;

(x)    Seller is a HUD approved mortgagee pursuant to Section 203 and Section 211 of the National Housing Act. No event has occurred, including but not limited to a change in insurance coverage, which would make the Seller unable to comply with HUD eligibility requirements or which would require notification to HUD. For the purposes hereof, HUD means the United States Department of Housing and Urban Development, or any successor thereto; and

(xi)    To the extent that any Mortgage Loans sold by Seller hereunder are MERS Loans, Seller is in good standing, and will comply in all material respects with the rules and procedures of Mortgage Electronic Registration Systems, Inc., ("MERS"), a corporation organized and existing under the laws of the State of Delaware, or any successor thereto in connection with the servicing of any Mortgage Loan registered with MERS (a "MERS Loan") on the system of recording transfers of mortgages electronically maintained by MERS (the "MERS System") for as long as such Mortgage Loans are registered with MERS.

(b)    Seller represents and warrants to, and covenants with, Purchaser with respect to each Mortgage Loan as of the related Closing Date (or such other date as set forth herein) for such Mortgage Loan:

(i)    The information required in Schedule One set forth on the Asset Schedule is complete, true and correct and the servicing information provided to Purchaser with respect to the Mortgage Loans as of the Transfer Date (as defined herein) is true and correct in all material respects;

(ii)    The mortgagor's real property securing repayment of the related Mortgage Note (as defined herein), consists of a fee simple interest or a Ground Lease (as defined herein) in a single parcel of real property improved by a (A) detached one-family dwelling, (B) detached two-to four family dwelling, (C) one-family unit in a Fannie Mae ("FNMA") eligible condominium project, (D) detached one-family dwelling in a planned unit development which is not a co-operative and which meets the eligibility requirements of FNMA, or (E) mobile home or manufactured dwelling which constitutes real property (the "Mortgaged Property") and is located in one of the fifty states of the United States of America or the District of Columbia;

(iii)    There are no delinquent real estate taxes, ground rents, water charges, sewer rents, Ground Lease rents, assessments, insurance premiums, leasehold payments, including assessments payable in future installments or other outstanding charges affecting the Mortgaged Property;

-5-

(iv)   The terms of the note or other evidence of indebtedness of the mortgagor secured by the Mortgaged Property (in each case, the "Mortgage Note") and the mortgage or other instrument creating a first or second lien on the Mortgaged Property (in each case, a "Mortgage") have not been impaired, waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the Mortgage, the substance of which waiver, alteration or modification is reflected on the Asset Schedule and has been approved by the primary mortgage guaranty insurer, if any, and the title insurer, to the extent required by the related policy; no instrument of waiver, alteration or modification has been executed, and no mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the primary mortgage guaranty insurer, if any, and the title insurer, to the extent required by the related policy and which assumption agreement is part of the Asset File or the Servicing File and the terms of which are reflected in the Asset Schedule;

(v)    The servicing and collection practices with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage servicing business, as conducted by prudent mortgage lending institutions which service mortgage loans of the same type in the jurisdiction in which the Mortgaged Property is located and in accordance with the terms of the Mortgage Note, Mortgage and other loan documents, whether such servicing was done by Seller, its affiliates or any servicing agent of any of the foregoing; the servicer of the Mortgage Loan has not assessed the mortgagor any delinquent payment fees that are not specifically permitted in the Mortgage or Mortgage Note, including but not limited to demand letter charges, or assessed the mortgagor interest on any advances made by the servicer;

(vi)   The Mortgage Note, the Mortgage and other agreements executed in connection therewith are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law) and free from any right of offset, counterclaim, rescission or other claim or defense, including the defense of usury. All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage and the Mortgage Note and the Mortgage have been duly and properly executed by such parties. The obligor under the Mortgage Note is a natural person;

(vii)  The Mortgage has not been satisfied, cancelled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument

-6-

been executed that would effect any such satisfaction, cancellation, subordination, rescission or release;

(viii)    The proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any improvements and as to disbursements of any escrow funds thereof have been complied with or any incomplete improvements are immaterial in nature or are weather related and do not significantly affect the value of the Mortgaged Property and no repair escrow has been established with respect to such incomplete improvements. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage have been paid, and the Mortgagor is not entitled to any refund of any amounts paid or due to the Mortgagee pursuant to the Mortgage Note or Mortgage;

(ix)    Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the related Mortgaged Property, directly or indirectly, for the payment of any amount required by the Mortgage Note or Mortgage;

(x)    The related Mortgage is a valid and enforceable first or second lien on the Mortgaged Property, which Mortgaged Property is free and clear of all encumbrances and liens having priority over the lien of the Mortgage except for (A) liens for real estate taxes and special assessments not yet due and payable, (B) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of the Mortgage, such exceptions appearing of record being acceptable to mortgage lending institutions generally or specifically reflected in the appraisal made in connection with the origination of the Mortgage Loan, (C) other matters to which like properties are commonly subject which do not, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property and (D) with respect to any second lien Mortgage Loan, the lien of the related first mortgage loan secured by the Mortgaged Property. The Mortgage Note and the Mortgage have not been assigned or pledged, other than to lenders whose liens will be released prior to the Closing Date or simultaneously with  Purchaser's purchase hereunder, on the Closing Date, pursuant to a duly executed Security Release in the form of Exhibit C (the "Security Release Certification"). Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, existing and enforceable first or second lien and first or second priority security interest on the property described therein. As of the Closing Date, Seller is the sole owner thereof and has full right to transfer and sell the Mortgage Loans to Purchaser free and clear of any lien or encumbrance equity, charge, claim or other security interest;

-7-

(xi)     If such Mortgage Loan is indicated on the Asset Schedule as having primary mortgage insurance, such Mortgage Loan is covered by a primary mortgage insurance policy as to the principal amount of the Mortgage Loan in excess of the portion required by FNMA of the Appraised Value (as defined herein) of the Mortgaged Property at the time of origination of the Mortgage. Such primary mortgage insurance policy is in full force and effect and the related Mortgage obligates the mortgagor to maintain such insurance and to pay all premiums and charges in connection therewith. The mortgage interest rate for the Mortgage Loan does not include any such insurance premium. Appraised Value means with respect to any Mortgaged Property, the lesser of (i) the value thereof as determined by an appraisal made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the minimum requirements of FNMA and the Federal Home Loan Mortgage Corporation or any successor thereto ("FHLMC"), and (ii) the purchase price paid for the related Mortgaged Property by the mortgagor with the proceeds of the Mortgage Loan, provided, however, in the case of a refinanced Mortgage Loan, such value of the Mortgaged Property is based solely upon the value determined by an appraisal made for the originator of such refinanced Mortgage Loan at the time of origination of such refinanced Mortgage Loan by an appraiser who met the minimum requirements of FNMA and FHLMC;

(xii)    There has been no error, omission, fraud, dishonesty, misrepresentation, negligence or similar occurrence on the part of any person, including without limitation the mortgagor, any appraiser, any builder or developer, or any other party in connection with the solicitation of the Mortgage Loan, the origination of the Mortgage Loan, the application of any insurance in relation to such Mortgage Loan or in connection with the sale of such Mortgage Loan to Purchaser, and there are no circumstances existing with respect to the Mortgage Loan which would permit the primary mortgage guaranty insurer to deny coverage under any policy;

(xiii)   The Mortgage Loan is covered by an American Land Title Association lender's title insurance policy or other generally acceptable form of policy of insurance acceptable to prudent mortgage lending institutions, issued by a title insurer acceptable to prudent mortgage lending institutions and qualified to do business in the jurisdiction where the Mortgaged Property is located (or by an attorney's abstract and opinion of title if the Mortgaged Property is located in Iowa), insuring Seller, its successors and assigns, as to the first or second priority lien of the Mortgage, as indicated on the Asset Schedule, in the original principal amount of the Mortgage Loan and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage interest rate and monthly payment. Additionally, such lender's title insurance policy affirmatively insures

-8-

ingress and egress to and from the Mortgaged Property, and against encroachments by or upon the Mortgaged Property or any interest therein. Seller is the sole insured of lender's title insurance policy, and lender's title insurance policy is in full force and effect. No claims have been made under the lender's title insurance policy, and neither Seller nor any prior holder has done, by act or omission, anything which would impair the coverage of the lender's title insurance policy;

(xiv)   In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the mortgagor;

(xv)    At the time of origination of the Mortgage Loan, no improvement located on or being part of the Mortgaged Property was in violation of any applicable zoning law or regulation and no such improvement is currently in violation of any applicable zoning law or regulation. No improvements on adjoining properties encroach upon the Mortgaged Property. The Mortgaged Property is lawfully occupied under applicable law; all inspections, licenses and certificates required in connection with the origination of any Mortgage Loan with respect to the occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities;

(xvi)   The assignment of Mortgage is in recordable form, except for the insertion of the name of the assignee, and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located. The endorsement of the Mortgage Note is valid, legal and enforceable under the laws of the jurisdiction in which the Mortgaged Property is located;

(xvii)  None of the Mortgage Loans are subject to a "buydown agreement";

(xviii) The Mortgaged Property securing the Mortgage Loan is insured by an insurer generally acceptable to prudent mortgage lending institutions against loss by fire and such hazards, including but not limited to damage by windstorm, as are covered under a standard extended coverage endorsement and such other hazards as are customary in the area where the Mortgaged Property is located; if the Mortgaged Property is a condominium unit, it is included under the coverage afforded by a blanket policy for the project; all such insurance policies contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee and all premiums thereon have been paid; if the Mortgaged Property is in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having

-9-

special flood hazards (and such flood insurance has been made available) a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect which policy conforms to the requirements of FNMA and FHLMC. All such insurance policies contain a standard mortgagee clause naming Seller, its successors and assigns as mortgagee and all premiums thereon have been paid. The Mortgage obligates the mortgagor thereunder to maintain all such insurance at the mortgagor's cost and expense, and on the mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at mortgagor's cost and expense and to seek reimbursement therefor from the mortgagor;

(xix)   If the Mortgage Loan provides that the interest rate on the principal balance of the related Mortgage Loan may be adjusted, all of the terms of the related Mortgage pertaining to interest rate adjustments, payment adjustments and adjustments of the outstanding principal balance have been made in accordance with the terms of the related Mortgage Note and applicable law and are enforceable and such adjustments will not affect the priority of the Mortgage lien;

(xx)    The Mortgaged Property complies with all applicable laws, rules and regulations, including but not limited to those relating to environmental matters, including but not limited to those relating to radon, asbestos and lead paint and neither the Seller nor, to the Seller's knowledge, the mortgagor, has received any notice of any violation or potential violation of such law;

(xxi)   The Mortgaged Property is free of damage and waste and there is no proceeding pending or, to the best of Seller's knowledge, threatened for the partial or total condemnation thereof;

(xxii)  Each agreement with a servicer of the Mortgage Loan, if any, provides for the termination of the servicing rights relating to the Mortgage Loan on the related Transfer Date, without the payment of any termination fee or other expense by Purchaser;

(xxiii) To the extent required under applicable law, each originator and subsequent mortgagee or servicer of the Mortgage Loan complied with all licensing requirements and was authorized to transact and do business in the jurisdiction in which the related Mortgaged Property is located at all times when it held or serviced the Mortgage Loan. Any and all requirements of any federal, state or local laws or regulations, including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, predatory lending, abusive lending, fair credit reporting, unfair collection practice, equal credit opportunity, fair housing and disclosure laws and regulations, applicable to the solicitation, origination, collection and servicing of such Mortgage

-10-

Loan have been complied with in all material respects; and any obligations of the holder of the Mortgage Note, Mortgage and other loan documents have been complied with in all material respects and the consummation of the transaction contemplated hereby will not involve the violation of any such laws or regulations, and Seller shall maintain in its possession, available for inspection of Purchaser or its designee, and shall deliver to Purchaser or its designee, upon two business days' request, evidence of compliance with such requirements;

(xxiv)    The mortgagor has received all disclosure materials required by applicable law with respect to the making of fixed rate mortgage loans in the case of fixed rate Mortgage Loans, and adjustable rate mortgage loans in the case of adjustable rate Mortgage Loans and rescission materials with respect to refinanced Mortgage Loans, and has executed any required consents that it has reviewed such information, which consents are and will remain in the Asset File;

(xxv)    The related Mortgage Note or Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder adequate for the realization against the Mortgaged Property of the benefits of the security, including realization by judicial, or, if applicable, non-judicial foreclosure, and in the case of a Mortgage designated as a deed of trust, by trustee's sale, and there is no homestead or other exemption available to the mortgagor which would interfere with such right to foreclosure;

(xxvi)    There is no action, suit or proceeding pending, or to the best of Seller's knowledge, threatened or likely to be asserted with respect to the Mortgage Loan against or affecting Seller before or by any court, administrative agency, arbitrator or governmental body;

(xxvii)    Except for any payment delinquency indicated on the Asset Schedule, there is no default, breach, violation or event of acceleration existing under the related Mortgage Note or Mortgage, and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration;

(xxviii)    No action, inaction, or event has occurred and no state of fact exists or has existed that has resulted or will result in the exclusion from, denial of, or defense to coverage under any applicable hazard insurance policy, PMI Policy or bankruptcy bond, irrespective of the cause of such failure of coverage. In connection with the placement of any such insurance, no commission, fee, or other compensation has been or will be received by Seller or any designee of Seller or any corporation in which Seller or any

-11-

officer, director, or employee had a financial interest at the time of placement of such insurance;

(xxix)    No Mortgage Loan is subject to the provisions of the Homeownership and Equity Protection Act of 1994 as amended or is considered a "high cost," "predatory" or "abusive" loan (or a similarly designated loan using different terminology) under any state, county or municipal laws or ordinances, including without limitation, the provisions of the Georgia Fair Lending Act, New York Banking Law, Section 6-1, the City of Oakland, California Anti-Predatory Lending Ordinance No. 12361, the New Jersey Home Ownership Security Act of 2002 (the "NJ Act") or any other statute or regulation providing "assignee" or "originator" liability to holders of such mortgage loans;

(xxx)    Each Mortgage Loan was originated by Seller or by a savings and loan association, a savings bank, a commercial bank or similar banking institution which is supervised and examined by a federal or state authority, or by a mortgagee approved as such by HUD;

(xxxi)    Except as set forth on Schedule Four, the Mortgage Loan has a fully assignable life of loan tax service contract with Transamerica Real Estate Tax Service or First American Real Estate Tax Service which may be assigned without the payment of any fee by Purchaser;

(xxxii)    There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

(xxxiii)    Principal payments on the Mortgage Loan commenced no more than sixty days after the proceeds of the Mortgage Loan were disbursed. With respect to each Mortgage Loan, the Mortgage Note is payable each month on the day identified on the Asset Schedule in monthly payments, which, except with respect to any Mortgage Loan which is identified on the Asset Schedule as a balloon mortgage loan (each, a "Balloon Mortgage Loan"), in the case of a fixed rate Mortgage Loan, are sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage interest rate, and in the case of an adjustable rate Mortgage Loan, are changed on each adjustment date, and in any case, are sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage interest rate. In the case of a Balloon Mortgage Loan, the Mortgage Note is payable in monthly payments based on a thirty (30) year amortization schedule and a final monthly payment substantially greater than the preceding monthly payment which is sufficient to amortize the remaining principal balance of the Balloon Mortgage Loan. No adjustable rate

-12-

Mortgage Loan is convertible to a fixed rate Mortgage Loan. The Mortgage Note does not permit negative amortization;

(xxxiv) The mortgagor has not notified Seller and Seller has no knowledge of any relief requested or allowed to the mortgagor under the Servicemembers Civil Relief Act or similar state laws;

(xxxv) The Mortgage Loan was underwritten in accordance with the underwriting standards of Seller in effect at the time the Mortgage Loan was originated which underwriting standards satisfy the standards of prudent mortgage lenders in the secondary market; and the Mortgage Note and Mortgage are on forms acceptable to FNMA and FHLMC;

(xxxvi) The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage on the Mortgaged Property and the security interest of any applicable security agreement or chattel mortgage referred to in (x) above;

(xxxvii) The Asset File contains an appraisal of the related Mortgaged Property which satisfied the standards of FNMA and FHLMC and was made and signed, prior to the approval of the Mortgage Loan application, by a qualified appraiser, duly appointed by Seller, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, whose compensation is not affected by the approval or disapproval of the Mortgage Loan and who met the minimum qualifications of FNMA and FHLMC. Each appraisal of the Mortgage Loan was made in accordance with the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989;

(xxxviii) No Mortgage Loan was made in connection with (A) the construction or rehabilitation of a Mortgaged Property or (B) facilitating the trade-in or exchange of a Mortgaged Property;

(xxxix) With respect to escrow deposits and escrow payments, if any, all such payments are in the possession of, or under the control of, Seller and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. No escrow deposits or escrow payments or other charges or payments due Seller have been capitalized under any Mortgage or the related Mortgage Note and no such escrow deposits or escrow payments are being held by Seller for any work on a Mortgaged Property which has not been completed;

(xl) Any principal advances made to the mortgagor prior to the related Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is

-13-

expressly insured as having first or second lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to FNMA and FHLMC. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(xli)    Seller has no knowledge of any circumstances or condition with respect to the Mortgage, the Mortgaged Property, the mortgagor or the mortgagor's credit standing that can reasonably be expected to cause the Mortgage Loan to be an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value of the Mortgage Loan;

(xlii)    No Mortgage Loan had a Loan-to-Value Ratio or a Combined Loan-to-Value Ratio (each as defined herein) at origination in excess of 100%. Loan-to-Value Ratio means with respect to any Mortgage Loan as of any date of determination, the ratio on such date of the outstanding principal amount of the Mortgage Loan to the Appraised Value of the Mortgaged Property.   Combined Loan-to-Value Ratio means with respect to any Mortgage Loan secured by a second lien on the Mortgaged Property securing the related Mortgage Note, the fraction, expressed as a percentage, the numerator of which is the sum of (a) the original principal balance of the Mortgage Loan, plus (b) the unpaid principal balance of the related first mortgage loan secured by the Mortgaged Property as of such date, and the denominator of which is the Appraised Value of the related Mortgaged Property;

(xliii)    No predatory or deceptive lending practices, including but not limited to, the extension of credit to the mortgagor without regard for the mortgagor's ability to repay the Mortgage Loan and the extension of credit to the mortgagor which has no apparent benefit to the mortgagor, were employed by the originator of the Mortgage Loan in connection with the origination of the Mortgage Loan.   No mortgagor was required to purchase single premium credit life insurance, disability insurance or similar insurance in connection with the origination of the Mortgage Loan;

(xliv)    The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder;

(xlv)    The Mortgage Loan complies with all applicable consumer credit statutes and regulations, including, without limitation, the respective Uniform Consumer Credit Code laws in effect in Colorado, Idaho, Indiana, Iowa, Kansas, Maine, Oklahoma, South Carolina, Utah and Wyoming, has been originated by a properly licensed entity, and in all other respects, complies with all of the material requirements of any such applicable laws;

-14-

(xlvi)    None of the Mortgage Loans is a refinancing of a zero interest rate or low interest loan made by a governmental agency or non-profit organization;

(xlvii)   With respect to each Mortgage Loan that is a simple interest Mortgage Loan, the Mortgage Loan is identified on the Asset Schedule as a simple interest Mortgage Loan, the Mortgage Loan is required to be serviced as a simple interest mortgage loan pursuant to the terms of the related Mortgage Note, and the servicing and collection practices used in connection therewith have been in accordance with legal, proper, prudent and customary practices for servicing simple interest mortgage loans;

(xlviii)  With respect to each Mortgage Loan that is secured in whole or in part by the interest of the mortgagor as a lessee under a ground lease of the related Mortgaged Property (a "Ground Lease") and not by a fee interest in such Mortgaged Property:

a.    The mortgagor is the owner of a valid and subsisting interest as tenant under the Ground Lease;

b.    The Ground Lease is in full force and effect, unmodified and not supplemented by any writing or otherwise;

c.    The mortgagor is not in default under any of the terms thereof and there are no circumstances which, with the passage of time or the giving of notice or both, would constitute an event of default thereunder;

d.    The lessor under the Ground Lease is not in default under any of the terms or provisions thereof on the part of the lessor to be observed or performed;

e.    The term of the Ground Lease exceeds the maturity date of the related Mortgage Loan by at least ten years;

f.    The Ground Lease or a memorandum thereof has been recorded and by its terms permits the leasehold estate to be mortgaged. The Ground Lease grants any leasehold mortgagee standard protection necessary to protect the security of a leasehold mortgagee;

g.    The Ground Lease does not contain any default provisions that could give rise to forfeiture or termination of the Ground Lease except for the non-payment of the Ground Lease rents;

-15-

h.    The execution, delivery and performance of the Mortgage do not require the consent (other than those consents which have been obtained and are in full force and effect) under, and will not contravene any provision of or cause a default under, the Ground Lease; and

i.    The Ground Lease provides that the leasehold can be transferred, mortgaged and sublet an unlimited number of times either without restriction or on payment of a reasonable fee and delivery of reasonable documentation to the lessor.

(xlix)    No Mortgage Loan originated on or after October 1, 2002 and prior to March 7, 2003 is subject to the Georgia Fair Lending Act (OGCA Sections 7-6A-1, et. seq.), as such Act may be amended from time to time;

(l)    With respect to any first lien Mortgage Loan, the Mortgaged Property was not, as of the date of origination of the Mortgage Loan, subject to a mortgage, deed of trust, deed to secure debt or other security instrument creating a lien subordinate to the lien of the Mortgage;

(li)    No mortgage loan which is a second lien was originated at the same time or otherwise in connection with any first lien Mortgage Loan except to the extent that Seller has disclosed the existence of the second lien mortgage loan to Purchaser;

(lii)    The Mortgage Loan documents with respect to each Mortgage Loan subject to prepayment penalties (i) specifically authorizes such prepayment penalties to be collected and such prepayment penalties are permissible and enforceable and were originated in accordance with the terms of the related Mortgage Loan documents and all applicable state, federal and local law (except to the extent that the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally or the collectability thereof may be limited due to acceleration in connection with a foreclosure) and (ii) include all necessary documentation to determine the amount of the prepayment penalty to be collected;

(liii)    The Asset File has been and the Servicing File will be delivered to Purchaser or its designee in accordance with the terms of this Agreement;

(liv)    Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA PATRIOT Act of 2001 (collectively, the "Anti-Money Laundering Laws"); Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of

-16-

the applicable mortgagor and the origin of the assets used by the said mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable mortgagor for purposes of the Anti-Money Laundering Laws; no Mortgage Loan is subject to nullification pursuant to Executive Order 13224 (the "Executive Order") or the regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury (the "OFAC Regulations") or in violation of the Executive Order or the OFAC Regulations, and no Mortgagor is subject to the provisions of such Executive Order or the OFAC Regulations nor listed as a "blocked person" for purposes of the OFAC Regulations;

(lv)    No Mortgage Loan is a "manufactured housing loan" pursuant to the NJ Act, and one hundred percent of the amount financed of any purchase money second lien Mortgage Loan subject to the NJ Act was used for the purchase of the related Mortgaged Property;

(lvi)    No points, fees or similar charges are required to be reimbursed to a mortgagor upon a prepayment in full of the related Mortgage Loan;

(lvii)    No mortgagor agreed to submit to arbitration to resolve any dispute arising out of or relating to in any way the Mortgage Loan transaction; and

(lviii)    No Mortgage Loan secured by a Mortgage Property located in the State of Illinois is in violation of the provisions of the Illinois Interest Act, including Section 4.1a which provides that no such Mortgage Loan with a Mortgage Interest Rate in excess of 8.0% per annum has lender-imposed fees (or other charges) in excess of 3.0% of the original principal balance of the Mortgage Loan.

(c)    It is understood and agreed that the representations and warranties set forth in this Section 5 shall survive the sale and delivery of the Assets to Purchaser and shall inure to the benefit of Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or assignment of Mortgage or any examination or failure to examine any Asset File.

(d)    For the purposes of this Agreement, (i) the term "to Seller's knowledge," or "to its knowledge" means that Seller reasonably believes such representation or warranty to be true, and has no actual knowledge or notice that such representation or warranty is inaccurate or incomplete, but that Seller, consistent with the standard of care exercised by prudent lending institutions originating assets of the type to which that representation or warranty applies, has no knowledge of any facts or circumstances that would render reliance thereon unjustified without further inquiry; and (ii) "to the best of Seller's knowledge," means that to Seller's knowledge, the representation or warranty is not incomplete or inaccurate, and Seller has conducted a reasonable inquiry (consistent with the standard of care exercised by prudent lending institutions originating assets of the type to which that representation or warranty applies) to assure the accuracy and completeness of the applicable statement. With respect to any representations and warranties made by Seller, in the event that it is discovered that the circumstances with respect to

-17-

the Asset are not accurately reflected in such representation and warranty notwithstanding the actual knowledge or lack of knowledge of Seller, then, notwithstanding that such representation and warranty is made "to the best of Seller's knowledge," or in reliance on or based on other information, there shall be a breach of such representation and Seller shall cure such breach or repurchase the affected Asset as provided in Section 5(e) hereof.

(e)    Upon discovery by either Seller or Purchaser of a breach of any of the foregoing representations and warranties as set forth in this Section 5 which adversely affects the value of the Assets or the interest of Purchaser (or which adversely affects the interests of Purchaser in the Asset in the case of a representation or warranty relating to a particular Asset), the party discovering such breach shall give prompt written notice to the other.  Within sixty (60) days of its discovery or its receipt of notice of any such breach of a representation or warranty, Seller shall cure such breach in all material respects or, at the option of Purchaser, shall repurchase the ownership interest in such Asset at a repurchase price (the "Repurchase Price") equal to the related amount specified on Schedule Two to the related Term Sheet, less any principal payments received by Purchaser, plus Purchaser's reasonable and customary out-of-pocket expenses incurred by Purchaser in transferring and servicing such Asset, including, without limitation, expenses incurred for maintenance and repairs, assessments, taxes and similar items, to the extent not paid out of an escrow account transferred by Seller to Purchaser, and attorney's fees and expenses incurred by Purchaser in connection with any enforcement procedures or otherwise with respect to such Asset or the transfer of such Asset to Seller or Purchaser and an additional amount equal to the rate of interest borne by the Asset multiplied by the outstanding principal balance of such Asset from the date interest was paid through on such Asset to the last day of the month such Asset is repurchased.  Purchaser shall release its interest in the Asset promptly upon its receipt of the Repurchase Price and shall immediately effect the reconveyance of such Asset to Seller.

(f)    Except as otherwise stated in the related Term Sheet, in the event that (i) the principal due on a Mortgage Loan is prepaid in full within six months of the related Cut-off Date, then Seller shall pay to Purchaser within ten business days of Purchaser notifying Seller of such prepayment an amount equal to the product of (A) the amount of such prepayment, times (B) the excess, if any, of the purchase price percentage, as set forth on Schedule Two, over 100%, less any prepayment penalties permitted to be collected by the Purchaser or (ii) the first or second scheduled monthly payment due to Purchaser following the related Closing Date on any Mortgage Loan is not made by the related mortgagor and received by the Purchaser's servicer or the prior servicer by the last day of the month in which it is or was due, such Mortgage Loan shall be repurchased by Seller at the Repurchase Price set forth in Section 5(e) above.

SECTION 6.  Closing Documents.  (a) The closing documents to be delivered on or prior to the initial Closing Date (the "Closing Documents") shall consist of each of the following:

(i)    four (4) fully executed original copies of this Agreement, including all exhibits hereto;

(ii)    one (1) fully executed original of the Bailee Letter Agreement;

-18-

(iii)   one (1) fully executed original of the Initial Trust Receipt issued pursuant to the Bailee Letter Agreement;

(iv)   one (1) fully executed original of an officer's certificate in the form attached hereto as <u>Exhibit H</u>, including all attachments thereto;

(v)    an original or a certified copy of a certificate or other evidence of merger or change of name, signed or stamped by the applicable regulatory authority, if any of the related Assets were acquired by Seller by merger or acquired or originated by Seller while conducting business under a name other than its present name, which shall be delivered by the Closing Date;

(vi)   four (4) fully executed original copies of the related Term Sheet, including all exhibits thereto, in the form attached hereto as <u>Exhibit B</u>;

(vii)  those documents set forth on <u>Exhibit A-1</u> hereto for the related Assets;

(viii) security releases from any warehouse lender with a lien on the related Mortgage Loans in the form attached hereto as <u>Exhibit C</u>;

(ix)   a Bill of Sale for the Mortgage Loans in the form attached hereto as <u>Exhibit D</u>;

(x)    a computer readable transmission of the payment history for each Mortgage Loan for the past twelve months; and

(xi)   such other documents as may be specified in the related Term Sheet.

(b)    The Closing Documents for the Mortgage Loans to be purchased on each subsequent Closing Date shall consist of each of the items specified in Subsection (a)(iii) through and including Subsection (a)(xi) above. With respect to the item specified in Subsection 6(a)(iv), such item shall only be delivered at Purchaser's request on subsequent Closing Dates.

The documents specified in Subsection 6(a)(vii) hereof for each Mortgage Loan shall be delivered by Seller to Purchaser or its designee at least five (5) business days prior to the related Closing Date.

SECTION 7. <u>Costs</u>. Each party will pay any commissions it has incurred and the fees of its attorneys in connection with the negotiations for, documenting of and closing of the transactions contemplated by this Agreement and each Term Sheet. If Purchaser requests the contents of the Asset File which have not been previously delivered hereunder, the original contents of such Asset File will be delivered by Seller. Seller will pay all costs and expenses incurred in connection with the preceding sentence. Seller shall be responsible for, and shall bear all fees and expenses related to, the recordation of assignments of Mortgage from Seller to Purchaser with respect to the Mortgage Loans. Seller shall be responsible for and shall bear all fees and expenses related to the recordation of any intervening assignments of Mortgage with respect to the Mortgage Loans.

[TPW: NYLEGAL:11558.20] 17999-00000  01/14/2005 01:50 PM

With respect to foreclosure costs and expenses for any Mortgage Loan, including attorneys' fees, Seller shall be responsible for all expenses for services rendered prior to the related Closing Date. With respect to foreclosure costs and expenses for any Mortgage Loan, including attorney's fees, Purchaser shall be responsible for all expenses for services rendered on or after the related Closing Date; provided, however, that Purchaser's prior consent shall be required with respect to the institution of any such foreclosure proceeding or proceedings to modify any Mortgage Loans. Seller and Purchaser hereby agree that Purchaser may continue any proceeding in Seller's name with respect to any Mortgage Loan if necessary to prevent a material adverse effect on Purchaser's interests with respect thereto or a delay in such proceeding.

SECTION 8. <u>Servicing</u>. The Assets are being sold on a servicing released basis. On the date specified in the related Term Sheet, Purchaser, or its designee, shall assume all servicing responsibilities related to the Assets and Seller shall cease all servicing responsibilities related to the Assets (the date of the actual transfer of servicing responsibilities for any Mortgage Loan being herein referred to as the "<u>Transfer Date</u>").

During the period between the related Cut-off Date and the related Transfer Date, Seller shall service the related Assets for the benefit of Purchaser in accordance with the terms of the related Mortgage and Mortgage Note and shall service the related Assets in order to protect Purchaser's interest in such Assets to the extent that a reasonably prudent servicer would for Assets of the same type in the applicable jurisdiction and in compliance with all applicable laws, rules and regulations and the loan documents. During the period between the related Closing Date and the related Transfer Date, Seller shall, at its cost and expense, take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the related Assets to Purchaser, or its designee, including but not limited to the following:

(a)    <u>Notice to Mortgagors</u>. Mail to the mortgagor of each Mortgage a letter advising such mortgagor of the transfer of the servicing of the related Mortgage Loan to Purchaser, or its designee, in accordance with the Cranston Gonzalez National Affordable Housing Act of 1990 as the same may be amended from time to time, <u>provided</u>, <u>however</u>, the content and format of the letter shall have the prior approval of Purchaser. Seller shall provide Purchaser with copies of all such notices no later than the related Transfer Date.

(b)    <u>Notice to Taxing Authorities and Insurance Companies</u>.    Transmit to the applicable taxing authorities and insurance companies (including primary mortgage insurance policy insurers, if applicable) and/or agents, notification of the transfer of the servicing to Purchaser, or its designee, and instructions to deliver all notices, tax bills and insurance statements, as the case may be, to Purchaser from and after the related Transfer Date. Seller shall provide Purchaser with copies of all such notices no later than the related Transfer Date.

(c)    <u>Delivery of Servicing Records</u>. On or prior to the related Transfer Date, forward to Purchaser, or its designee, all servicing records, the Servicing File and the Asset File in any servicer's possession relating to each related Asset including, but not limited to, the appraisal, loan application and underwriting file obtained in connection with the origination of the related Mortgage Loan, as well as a payment history for the related Mortgage Loan for the past five (5)

-20-

years or in the case of a Mortgage Loan originated within the past five years, since the origination of such Mortgage Loan.

(d) <u>Escrow Payments</u>. On the related Transfer Date provide Purchaser with an accounting statement of the escrow and other payments, for taxes, governmental assessments, insurance premiums, security deposits, water, sewer and municipal charges, and suspense balances and loss draft balances sufficient to enable Purchaser to reconcile the amount of such payment with the accounts of the related Mortgage Loans.

(e) <u>Corporate Advances</u>. On the related Transfer Date, provide Purchaser, or its designee, with copies of all receipts, invoices and bills pertaining to foreclosure expenses, attorney's fees, bankruptcy fees and other corporate advances along with a loan level report providing detail on each expense paid by Seller. In addition, Seller shall forward on a weekly basis all receipts, invoices and bills pertaining to foreclosure expenses, attorney's fees, bankruptcy fees and other corporate advances, received by Seller after the related Transfer Date which are reimbursable through the Insurance Agreements (as defined in Addendum 2). Purchaser and Seller acknowledge that the amount of the escrow and corporate advances (as described in Sections 8(d) and 8(e)) may vary from the amount shown on the Asset Schedule to reflect activity occurring after the related Closing Date.

(f) <u>Payoffs and Assumptions</u>. On or prior to the related Transfer Date, provide to Purchaser, or its designee, copies of all assumption and payoff statements generated with respect to the Mortgage Loans from the period beginning sixty (60) days prior to the related Transfer Date until the related Transfer Date.

(g) <u>Payments Received Prior to the Transfer Date</u>. Prior to the related Transfer Date all payments received by Seller on each Asset shall be properly applied by Seller to the account of the particular mortgagor. Any unapplied funds and suspense payments shall be wire transferred to Purchaser on the related Transfer Date and shall be applied by Purchaser as deemed appropriate in Purchaser's sole discretion. In the event the related Transfer Date is more than 30 days following the related Closing Date, in addition to such related Transfer Date payment, Seller shall remit to Purchaser on the fifth business day of each month all amounts received with respect to the Assets which have not previously been remitted.

(h) <u>Payments Received After the Transfer Date</u>. The amount of any payments received by Seller after the related Transfer Date with respect to the related Assets shall (i) in the case of payments received within thirty days of the related Transfer Date, be forwarded to Purchaser by overnight mail or courier on the date of receipt and (ii) in the case of payments received thereafter, be forwarded to Purchaser on a weekly basis. Notwithstanding the foregoing, any payment received by Seller for the purposes of a full payoff and received within ninety days of the related Transfer Date shall be forwarded to Purchaser by courier or overnight mail on the date of receipt. Seller shall notify Purchaser of the particulars of such payment, which notification requirements shall be satisfied if Seller forwards with the payment sufficient information to permit appropriate processing of the payment by Purchaser and shall provide necessary and appropriate legal application of such payments which shall include, but not be limited to, endorsement of such payment to Purchaser or equivalent substitute payment with the

-21-

particulars of the payment such as the account number, dollar amount, date received and any special mortgagor application instructions.

    (i)    <u>Misapplied Payments</u>.  Misapplied payments shall be processed as follows:

        (i)    All parties shall cooperate in correcting misapplication errors;

        (ii)    The party receiving notice of a misapplied payment occurring prior to the related Transfer Date shall immediately notify the other party;

        (iii)    If a misapplied payment which occurred prior to the related Transfer Date cannot be identified and said misapplied payment has resulted in a shortage in any accounts established for the purpose of depositing payments with respect to the Assets, Seller shall be liable for the amount of such shortage.  Seller shall reimburse Purchaser for the amount of such shortage within thirty (30) days after receipt of written demand therefor from Purchaser;

        (iv)    If a misapplied payment which occurred prior to the related Transfer Date has created an incorrect Purchase Price as the result of an inaccurate outstanding principal balance, a check shall be issued to the party disadvantaged by the incorrect payment application within five (5) business days after notice therefor by the other party; and

        (v)    Any check issued under the provisions of this Section 8 shall be accompanied by a statement indicating the corresponding Seller and/or Purchaser Mortgage Loan identification number and an explanation of the allocation of any such payments.

    (j)    <u>Books and Records</u>.  On the related Transfer Date, the books, records and accounts of Seller with respect to the related Assets shall be in accordance with all applicable industry standards, and with all additional Purchaser requirements as to which Seller has received notice.

    (k)    <u>Reconciliation</u>.  On or prior to the related Transfer Date, with respect to the related Mortgage Loans, reconcile principal balances and make any monetary adjustments required by Purchaser.  Any such monetary adjustments will be transferred between Seller and Purchaser as appropriate.

    (l)    <u>IRS Forms</u>.  File, as and when required by law, all IRS forms 1099, 1099A, 1098 or 1041 and K-1 in relation to the servicing and ownership of the Mortgage Loans for the portion of such year the Mortgage Loans were serviced by Seller.  Seller shall provide copies of such forms to Purchaser upon request and Seller shall reimburse Purchaser for any costs or penalties incurred by Purchaser due to Seller's failure to comply with this paragraph.

    (m)    <u>Consultation with Purchaser</u>. During the period between the related Cut-off Date and the related Transfer Date, consult with Purchaser (i) prior to instituting any new foreclosure

-22-

proceedings or seeking bankruptcy relief on any Mortgage Loan or (ii) with respect to any default expenditures incurred (exclusive of property inspection expenditures, loss mitigation expenditures or loss mitigation actions taken) relating to any Asset. Seller shall contact Mr. Steve Staid at (713) 960-9676 with respect to any consultations hereunder.

(n)    Transfer of Servicing. On the related Transfer Date Seller shall transfer servicing of the related Assets to Purchaser pursuant to the terms of this Agreement and the procedures set forth in the Servicing Transfer Instructions attached hereto as Exhibit G, as amended from time to time by Purchaser. The provisions of the Servicing Transfer Instructions shall be deemed incorporated in this Agreement and the related Term Sheet, and, in the event of any conflict between the provisions of the Servicing Transfer Instructions, this Agreement and the related Term Sheet, the Agreement shall control. At Purchaser's option and upon reasonable notice, Seller shall effect the transfer of servicing for the related Assets by means of a "tape to tape" transfer. All information provided to Purchaser or its designee shall be provided electronically. Seller shall pay any costs and expenses Purchaser incurs related to the manual transfer of any information to Purchaser, or its designee.

(o)    Mortgage Loans in Litigation. On or prior to the related Transfer Date:

(i)    deliver written notification to Purchaser, pursuant to Section 13, of the Mortgage Loans in litigation on the related Transfer Date including the names and addresses of all parties involved in such litigation and Seller shall deliver to Purchaser all documents related to such litigation.

(ii)    notify the clerk of the court and all counsel of record involved in such litigation that ownership of the Mortgage Loan in question has been transferred from Seller to Purchaser.

On or prior to the related Transfer Date, Seller shall, through its attorney, if requested by Purchaser and in cooperation with Purchaser's attorney, file appropriate pleadings with the court that will (i) substitute Purchaser's attorney for Seller's attorney, and (ii) remove Seller as a party to the litigation and substitute Purchaser as the real party in interest. If Seller fails to substitute Purchaser's attorney for Seller's attorney or to remove Seller as a party in interest, then Seller shall pay continued legal expenses in such litigation until such time as the substitution is effected. In addition, Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, Seller's failure to effect the substitution required pursuant to this Section 8(o). In no event shall Purchaser be liable for any contingency arrangements of Seller with Seller's attorneys.

(p)    Notice to Attorneys. Mail to each of Seller's bankruptcy attorney, Seller's foreclosure attorney, the mortgagor's attorney and the bankruptcy trustee a letter advising such

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

attorney that Seller has sold the Mortgage Loan on the related Closing Date to Purchaser. Seller shall provide Purchaser with copies of such letters no later than the related Transfer Date.

(q)    Mortgage Loans in Bankruptcy. In accordance with Bankruptcy Rule 3001(e), Seller shall take all actions necessary to file, on or prior to the related Transfer Date, (i) proofs of claims in pending bankruptcy cases involving any Mortgage Loans for which Seller has not already filed a proof of claim, and (ii) evidence of the terms of the purchase of the Mortgage Loans with the appropriate bankruptcy court in cases in which Seller has filed proofs of claims. Seller shall prepare and provide to Purchaser on the related Transfer Date, an Affidavit and Assignment of Claim substantially in the form attached hereto as Exhibit E (modified as appropriate to comply with applicable recording statutes) for all Mortgage Loans that are in bankruptcy as of the related Transfer Date. In addition, Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, Seller's failure to effect the actions required pursuant to this Section 8(q).

SECTION 9. Hazard Insurance. If any Mortgaged Property is damaged on or after the related Cut-off Date as a result of fire, windstorm, flood, earthquake, natural disaster or other hazard, the proceeds of any such insurance policy relating to the related Mortgaged Property shall be paid to Purchaser and/or the related mortgagor to be applied as required by the Mortgage Note, Mortgage or other loan documents.

SECTION 10. No Solicitation. From and after the related Cut-off Date, Seller hereby agrees that it will not take any action or permit or cause any action to be taken by any of its agents or affiliates, or by any independent contractors on Seller's behalf, to personally, by telephone or mail, solicit the borrower or obligor under any Mortgage Loan for the purpose of refinancing, in whole or in part. It is understood and agreed that all rights and benefits relating to the solicitation of any mortgagors and the attendant rights, title and interest in and to the list of such mortgagors and data relating to their Mortgages (including insurance renewal dates) shall be transferred to Purchaser pursuant hereto on the related Closing Date and Seller shall take no action to undermine these rights and benefits. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by Seller or any affiliate of Seller which are directed to the general public at large, including, without limitation, mass mailings based on commercially acquired mailing lists, and newspaper, radio and television advertisements shall not constitute solicitation under this Section 10.

SECTION 11. Confidentiality. Seller and Purchaser each hereby agrees to fully comply with all applicable laws, rules and regulations governing the confidentiality of any information acquired from or concerning the mortgagors.

SECTION 12. Survival of Agreement. This Agreement includes provisions which the parties hereto intend will remain in effect after the closing of the transaction contemplated by this Agreement and the related Term Sheet. Accordingly, this Agreement and the related Term Sheet shall survive and remain in effect after the closing.

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

SECTION 13.  Notices.  All demands, notices and communications under this Agreement and the related Term Sheet shall be in writing and shall be deemed to have been duly given if (i) mailed by registered or certified mail, return receipt requested or by overnight delivery service, addressed to the appropriate party hereto at the address stated in the introduction to this Agreement or (ii) transmitted by facsimile transmission or by electronic mail with acknowledgment, to the appropriate party hereto at the facsimile number or the electronic mail address provided by the other party to this Agreement.   Any such demand, notice or communication shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced by the date noted on the return receipt or overnight delivery receipt).

SECTION 14.  Severability Clause.  Any part, provision, representation or warranty of this Agreement and the related Term Sheet which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

SECTION 15.  Counterparts.   For the purpose of facilitating the execution of this Agreement, and for other purposes, this Agreement and the related Term Sheet may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

SECTION 16.  Place of Delivery and Governing Law.  This Agreement and the related Term Sheet shall be deemed to have been made in the State of New York.  This Agreement and the related Term Sheet shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, excluding conflict of laws issues.   The parties hereby agree that all disputes arising hereunder and in the related Term Sheet shall be submitted to and hereby subject themselves to the jurisdiction of the courts of competent jurisdiction, state and federal, in the State of New York.

SECTION 17.  Further Assurances.  Each party to this Agreement agrees to execute and deliver such instruments and take such actions as the other party may, from time to time, reasonably request to effect the purpose and carry out the terms of this Agreement.

SECTION 18.  Successors and Assigns; Assignment.  This Agreement and the related Term Sheet shall bind and inure to the benefit of and be enforceable by Seller and Purchaser and the respective successors and assigns of Seller and Purchaser.  Purchaser may assign this Agreement and the related Term Sheet to any person to whom any Mortgage Loan is transferred whether pursuant to a sale or financing and to any person to whom the servicing or master servicing of any Mortgage Loan is sold or transferred.  Upon any such assignment, the person to whom such assignment is made shall succeed to all rights and obligations of Purchaser under this Agreement and the related Term Sheet to the extent of the related Mortgage Loan or Mortgage Loans and this Agreement and the related Term Sheet, to the extent of the related Mortgage Loan

-25-

or Loans, shall be deemed to be a separate and distinct agreement between Seller and such purchaser, and a separate and distinct agreement between Seller and each other purchaser to the extent of the other related Mortgage Loan or Loans. In the event that this Agreement and the related Term Sheet is assigned to any person to whom the servicing or master servicing of any Mortgage Loan is sold or transferred, the rights and benefits under this Agreement which inure to Purchaser shall inure to the benefit of both the person to whom such Mortgage Loan is transferred and the person to whom the servicing or master servicing of the Mortgage Loan has been transferred; provided that, the right to require a Mortgage Loan to be repurchased by Seller pursuant to Subsection 5(e) shall be retained solely by Purchaser. This Agreement and the related Term Sheet shall not be assigned, pledged or hypothecated by Seller to a third party without the consent of Purchaser.

SECTION 19. Indemnification. Seller agrees to indemnify Purchaser and each of its officers, directors, employees, agents and subcontractors and to hold each of them harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that are related to or arise from a breach of any representation and warranty or covenant under this Agreement and the related Term Sheet of Seller, and any action of any originator, holder or servicer of the Mortgage Loans occurring prior to the related Transfer Date.

SECTION 20. Amendments. Neither this Agreement nor any Term Sheet, nor any provision hereof may be changed, waived, discharged or terminated orally, but only by a written instrument signed by both Seller and Purchaser.

SECTION 21. Interpretation. For all purposes of this Agreement and the related Term Sheet, initially capitalized terms used herein have the meanings ascribed hereto in this Agreement. Except as expressly otherwise provided herein or unless the context otherwise requires, for purposes of this Agreement the words "herein," "hereto," "hereof" and "hereunder" and other words of similar effect shall refer to this Agreement as a whole and not to any particular provisions.

SECTION 22. Intention of the Parties. It is the intention of the parties that Purchaser is purchasing, and Seller is selling, the related Assets and not a debt instrument of Seller or any other security. Accordingly, each party intends to treat each transaction for federal income tax purposes and each transaction shall be reflected on Seller's books and records, tax returns, balance sheet and other financial statements as a sale by Seller, and a purchase by Purchaser, of the related Assets.

SECTION 23. Reproduction of Documents. This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular

-26-

course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 24. <u>Exhibits</u>.  The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

SECTION 25. <u>Bid Letter</u>.  The terms and conditions set forth in the bid letter between Purchaser and Seller (the "<u>Bid Letter</u>") with respect to each Closing Date shall be incorporated herein.  In the event of any conflict between the terms of this Agreement and the related Bid Letter, this Agreement shall control.

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

IN WITNESS WHEREOF, Seller and Purchaser have caused their names to be signed hereto by their respective authorized officers as of the date first above written.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, LP


By: _____
Name:
Title:


CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC


By: _____
Name:
Title:

EXHIBIT A-1

CONTENTS OF Asset FILE

With respect to each Mortgage Loan, the Asset File shall include each of the following items:

1.    The original Mortgage Note, bearing all intervening endorsements, endorsed, "Pay to the order of _____, without recourse" and signed in the name of Seller by an authorized officer or by facsimile signature, including any riders thereto. In the event that the Mortgage Loan was acquired by Seller in a merger, the signature must be in the following form: "[Seller, successor by merger to name of predecessor]"; and in the event that the Mortgage Loan was acquired or originated by Seller while doing business under another name, the signature must be in the following form: "[Seller], formerly known as [previous name]" or in lieu thereof, a lost note affidavit with indemnification with a copy of the lost Mortgage Note attached thereto, in a form acceptable to Purchaser.

If Seller chooses to use facsimile signatures to endorse Mortgage Notes, Seller must provide in an officer's certificate that the endorsement is valid and enforceable in the jurisdiction(s) in which the Mortgaged Properties are located and must retain in its corporate records the following specific documentation authorizing the use of facsimile signatures: (i) a resolution from its board of directors authorizing specific officers to use facsimile signatures; stating that facsimile signatures will be a valid and binding act on Seller's part; and authorizing Seller's corporate secretary to certify the validity of the resolution, the names of the officers authorized to execute documents by using facsimile signatures, and the authenticity of specimen forms of facsimile signatures; (ii) the corporate secretary's certification of the authenticity and validity of the board of directors' resolution; and (iii) a notarized "certification of facsimile signature," which includes both the facsimile and the original signatures of the signing officer(s) and each officer's certification that the facsimile is a true and correct copy of his or her original signature.

2.    Except as provided herein and for each Mortgage Loan that is not a MERS Loan, either: (i) the original recorded Mortgage, including all riders thereto, with recording information thereon, together with a certified true copy of the original power-of-attorney showing the recording information thereon if the Mortgage was executed by an attorney-in-fact; (ii) a certified true copy of the Mortgage, including all riders thereto, and of the power-of-attorney (if applicable) the originals of which have been transmitted for recording, until such time as the originals are returned by the public recording office, and in the case of each MERS Loan, the original Mortgage, noting the presence of the Mortgage Identification Number for any MERS Loan (the "MIN") and either language indicating that the Mortgage Loan is a Mortgage Loan as to which MERS is acting as mortgagee, solely as nominee for the originator of such Loan and its successors and assigns (a "MOM Loan") or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording thereon, or (iii) a copy of the Mortgage, including all riders thereto, certified by the public recording office in those instances where the public recording office retains the

A1/1

original or the original is lost, together with a duplicate original mortgagee's certificate of title.

3.  In the case of each Mortgage Loan that is not a MERS Loan, the original individual assignment of Mortgage for each Mortgage Loan, in blank, in form and substance acceptable for recording but not recorded; provided, however, that certain recording information will not be available if, as of the Closing Date, Seller has not received the related recorded Mortgage from the recorder's office.  In the event that the Mortgage Loan was acquired by Seller in a merger, the assignment must be by "[Seller], successor by merger, to [name of predecessor]"; and in the event the Mortgage Loan was acquired or originated by Seller while doing business under another name, the assignment must be by "Seller, formerly known as [previous name]."

4.  Original or copy of the policy of title insurance (or, if such policy has not yet been issued by the insurer, the preliminary title report).

5.  Originals of all intervening assignments, if any, with evidence of recording thereon, or certified true copies with evidence that the originals have been transmitted for recording until such time as the originals are returned by the public recording office, or a copy of each such assignment certified by the public recording office if such office retains the original, or if such original is lost.

6.  Originals or certified copies of all assumption, modification, consolidation or extension agreements, if any.

7.  Any security agreement, chattel mortgage or equivalent executed in connection with the Mortgage.

A-1/2

EXHIBIT A-2

CONTENTS OF SERVICING FILE

With respect to each Mortgage Loan, the Servicing File shall include each of the following items:

1.    A copy of each item in the Mortgage File.

2.    All necessary prepayment penalty documentation required to determine the amount of the prepayment penalty to be collected.

3.    The original hazard insurance policy and, if required by law, flood insurance policy.

4.    All required disclosure statements.

5.    Amortization schedule.

6.    Residential loan application.

7.    Mortgage Loan closing statement.

8.    Verification of employment and income, except for Mortgage Loans originated under a Limited Documentation Program.

9.    Verification of acceptable evidence of source and amount of downpayment, except for Mortgage Loans originated under a Limited Documentation Program.

10.    Credit report on the mortgagor.

11.    Residential appraisal report.

12.    Photograph of the Mortgaged Property.

13.    Survey of the Mortgaged Property (if any).

14.    Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e., map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

15.    If available, termite report, structural engineer's report, water potability and septic certification.

16.    Sales contract, if applicable.

17.    The original or copy of the policy of primary mortgage guaranty insurance or, where such insurance is provided by a master policy, a copy of such master policy together with the original certificate of insurance or a facsimile copy thereof, if any.

18.    Tax receipts, insurance premium receipts, ledger sheets, payment history from date of origination, insurance claim files, correspondence, current and historical computerized data files, and all other processing, underwriting and closing papers and records which are customarily contained in a mortgage loan file and which are required to document the Mortgage Loan or to service the Mortgage Loan.

A-2/2

EXHIBIT B

FORM OF TERM SHEET

This TERM SHEET (the "Term Sheet") dated _____ __, 200__ between GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, LP, a Pennsylvania limited partnership corporation located at 300 Welsh Road Drive, Building 5, Horsham, Pennsylvania 19044 (the "Seller") and Credit-Based Asset Servicing and Securitization LLC, a Delaware limited liability company, located at 335 Madison Avenue - 19th Floor, New York, New York 10017 (the "Purchaser") is made pursuant to the terms and conditions of that certain Master Asset Purchase Agreement (the "Agreement") dated as of March 1, 2005, between the Seller and the Purchaser, the provisions of which are incorporated herein as if set forth in full herein, as such terms and conditions may be modified or supplemented hereby. Capitalized terms used in this Term Sheet and not otherwise defined herein shall have the meanings specified in the Agreement.

<u>Definitions</u>

For purposes of the Assets identified on <u>Schedule One</u> hereto to be sold pursuant to the Agreement, the following terms shall have the following meanings:

<u>Closing Date</u>: _____ __, 200__, or such other date as the parties may agree.

<u>Cut-off Date</u>: _____ __, 200__

Principal Balance:    $_____

<u>Transfer Date</u>: _____ __, 200__

Purchase Price:          With respect to each Asset, the amount specified on <u>Schedule Two</u> hereto.

Additional Terms and Conditions

The Mortgage Loans identified on <u>Schedule Four</u> hereto do not have tax service contracts.

On the Closing Date, the Purchaser has purchased certain mortgage loans with document deficiencies (the "Affected Mortgage Loans") as listed on <u>Schedule Three-A</u> and <u>Schedule Three-B</u> attached hereto. In consideration of the Purchaser's agreement to purchase the Affected Mortgage Loans, the Purchaser and the Seller hereby agree as follows:

1.    The Seller shall deliver to the Purchaser or its designee, Litton Loan Servicing LP, 4828 Loop Central Drive, Houston, Texas 77081, Attention: Lela Derouen, within (a) 60 days from the Closing Date with respect to any Mortgage Loan originated more than 6 months prior to the Closing Date (the "Seasoned Loan Cure Date") all necessary documentation to cure the document deficiencies as outlined on <u>Schedule Three-A</u> and (b) 120 days from the Closing Date with respect to any Mortgage Loan originated within 6 months of the Closing Date (the "Newly Originated Loan Cure Date", together with the Seasoned Loan

B-1

Cure Date, the "Cure Date") all necessary documentation to cure the document deficiencies as outlined on Schedule Three-B. In the event that the Seller fails to deliver all necessary documentation to cure the deficiency with respect to any Affected Mortgage Loan by the applicable Cure Date, the Seller will repurchase such Affected Mortgage Loan at the Repurchase Price specified in the Agreement. The repurchase will occur no later than one (1) business day from the applicable Cure Date.

2.    Contemporaneously with any repurchase of an Affected Mortgage Loan, the Purchaser will reconvey such Mortgage Loan to the Seller by delivering to the Seller or the Seller's designee the collateral documents delivered to the Purchaser with proper assignment and endorsement documentation.

3.    The rights granted hereunder shall be cumulative with the rights provided under the Agreement and shall inure to the benefit of the Purchaser and its successors and assigns. This Term Sheet shall survive the closing of the transaction and shall not be merged with the Agreement or any other agreement, and shall be independently enforceable by the parties hereto. For the purpose of facilitating the execution of this Term Sheet, and for other purposes, this Term Sheet may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed to this Term Sheet by their respective duly authorized officers as of the date first above written.

GATEWAY        FUNDING        DIVERSIFIED
MORTGAGE SERVICES, LP


By: _____
Name:
Title:

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC


By: _____
Name:
Title:

B-3

SCHEDULE ONE

Asset SCHEDULE

1.        Loan #

2.        Originator Name

3.        Borrower Name Property Address (including Zip Code)

4.        UPB as of Cut-Off Date

5.        Mortgage Note Date

6.        Paid to Date

7.        Lien Priority (First or Second)

8.        PMI Coverage and name of Insurer

9.        Origination, Appraisal, Value

10.       Seller's BPO Value, if any

11.       LTV at Origination

12.       Combined LTV at Origination (for second liens)

13.       Original Note Rate

14.       Current Note Rate

15.       Original P&I

16.       Current P&I

17.       12 month Cash Collection

18.       Original Maturity Date

19.       Type of Plan (Bankruptcy, Foreclosure, etc.)

20.       Modification Date

21.       Foreclosure Flag

22.       Bankruptcy Flag

B-4

23.    Plan Maturity Date

24.    Fixed or Adjustable Interest Rate

25.    Index

26.    Next Adjustment Date

27.    Margin

28.    Original Term

29.    Current Term (if Modified)

30.    Periodic or Lifetime Caps or Floors

31.    Property Type

32.    Arrearage

33.    Accrued Interest

34.    Escrow Advances

35.    Claimable Corporate Advances

36.    Prepayment Penalty Percentage

37.    Prepayment Penalty Term

38.    Section 32 Disclosure

39.    Purpose (Purchase Finance, Rate (Term Refinancing, Cash-Out Refinancing, etc.)

40.    Documentation Style (Full, Alternative, Reduced, etc.)

41.    Owner Occupied, Investment, etc.

42.    Ground Leases (Y/N)

43.    Balloon Loans (Y/N)

B-5

REO PROPERTY SCHEDULE

1.    Loan/REO Property #

2.    Borrower Name Property Address (including Zip Code)

3.    Property Type

4.    Occupancy Status

5.    Foreclosure Status

6.    Bankruptcy Status and Chapter

B-6

SCHEDULE TWO

PURCHASE PRICE SCHEDULE

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

SCHEDULE THREE-A

DOCUMENT DEFICIENCY SCHEDULE

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

SCHEDULE THREE-B

DOCUMENT DEFICIENCY SCHEDULE

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

SCHEDULE FOUR

MORTGAGE LOANS WITHOUT TAX SERVICE CONTRACTS

B-10

EXHIBIT C

FORM OF SECURITY RELEASE CERTIFICATION

I.  Release of Security Interest

_____ ("Lender"), hereby relinquishes any and all right, title and interest it may have in and to the Assets described in Schedule One attached hereto upon purchase thereof by Credit-Based Asset Servicing and Securitization LLC from the Seller named below pursuant to that certain Master Asset Purchase Agreement, dated as of March 1, 2005, as of the date and time of receipt by Lender of $_____ for such Mortgage Loans (the "Date and Time of Sale"), and certifies that all notes, deeds, mortgages, assignments and other documents in its possession relating to such Assets have been delivered and released to the Seller named below or its designees as of the Date and Time of Sale.

Name and Address of Lender

_____

(Name)

_____

(Address)

By:

C-1

## II. Certification of Release

The Seller named below hereby certifies to Credit-Based Asset Servicing and Securitization LLC that, as of the Date and Time of Sale of the above mentioned Assets to Credit-Based Asset Servicing and Securitization LLC, the security interests in the Assets released by the above named company comprise all security interests relating to or affecting any and all such Assets. The Seller warrants that, as of such time, there are and will be no other security interests affecting any or all of such Assets.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, LP
Seller

By: _____

Name: _____

Title: _____

C-2

EXHIBIT D

FORM OF BILL OF SALE

GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, LP hereby absolutely sells, transfers, assigns, sets-over and conveys to Credit-Based Asset Servicing and Securitization LLC, a limited liability company organized under the laws of the State of Delaware, without recourse:

(a)     All right, title and interest in and to each of the assets identified in the Schedule attached hereto as <u>Schedule One</u> including the servicing rights appurtenant thereto; and

(b)     All principal, interest or other proceeds of any kind received after the close of business on _____ __, 200__ with respect to such assets, including but not limited to insurance proceeds, condemnation awards and other proceeds derived from the conversion, voluntary or involuntary, of any of such assets into cash or other liquidated property.

The ownership of each Mortgage Note, Mortgage, Deed and the contents of the Asset File is vested in Purchaser and the ownership of all records and documents with respect to the related Asset prepared by or which come into the possession of Seller shall immediately vest in Purchaser and shall be retained and maintained, in trust, by Seller at the will of Purchaser in such custodial capacity only. The sale of each Asset shall be reflected as a sale on Seller's business records, tax returns and financial statements.

This Bill of Sale is made pursuant to, and is subject to the terms and conditions of, that certain Master Asset Purchase Agreement dated as of March 1, 2005 between GATEWAY Funding Diversified Mortgage Services, LP, as Seller, and Credit-Based Asset Servicing and Securitization LLC, as Purchaser (the "<u>Agreement</u>"). Seller confirms to Purchaser that the representations and warranties set forth in Section 5 of the Agreement are true and correct as of the date hereof.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

DATED: _____

GATEWAY     FUNDING     DIVERSIFIED MORTGAGE SERVICES, LP

By: _____
Name:
Title:

D-1

# EXHIBIT E

## FORM OF AFFIDAVIT AND ASSIGNMENT OF CLAIM

State of _____

County of _____

The undersigned, being first duly sworn, deposes and states as follows:

_____ ("Assignor"), acting by and through its duly authorized representatives, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer, assign and set over to _____, a _____ ("Assignee"), its successors and assigns, all of the Assignor's interest in any claim in the bankruptcy case commenced by or against _____ ("Debtor") in the matter of _____ (U.S. Bankruptcy Court, _____, Case No. _____) ("Bankruptcy Claim"), or such part of said Bankruptcy Claim as is based on the promissory note of _____ dated _____, and payable to _____.

For purposes of Bankruptcy Rule 3001, this affidavit and assignment represents the unconditional transfer of the Bankruptcy Claim or such part of the Bankruptcy Claim as is based on the promissory note or notes described in the preceding paragraph; and shall constitute the Assignor's acknowledgment of the transfer and statement of the consideration therefor, as required by said Rule 3001.

The consideration of the transfer was cash. No specific amount of the total consideration was assigned to the debt which forms the basis of the Bankruptcy Claim. This affidavit and assignment shall also evidence the unconditional transfer of the Assignor's interest in any security held for the Bankruptcy Claim.

[TPW: NYLEGAL:1558.20] 17999-00000 01/14/2005 01:50 PM

IN WITNESS WHEREOF, the Assignor has caused this document to be executed at _____, _____ on _____, _____.

GATEWAY      FUNDING      DIVERSIFIED
MORTGAGE SERVICES, LP


By: _____
Name:
Title:


STATE OF _____    )
                                  )
COUNTY OF _____   )


On _____, _____, before me the undersigned Notary Public, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed this instrument as _____ of _____, and acknowledged to me that the said corporation executed it.

WITNESS my hand and official seal.

Dated:                           _____
                                         Notary Public

E-2

EXHIBIT F

FORM OF BAILEE LETTER AGREEMENT

_____ ___, 200__

Reginald L. Carter
The Bank of New York
700 South Flower Street, Suite 200
Los Angeles, California 90017
Phone:  (213) 630-6426
Fax:     (213) 955-2493
E-mail:  recarter@bankofny.com


Re:     Sale of certain mortgage loans from Gateway Funding Diversified Mortgage Services, LP
        (the "Seller") to Credit-Based Asset Servicing and Securitization LLC (the "Purchaser")
        pursuant to that certain Master Asset Purchase Agreement, dated as of March 1, 2005,
        between the Seller and the Purchaser (the "Agreement").

Ladies and Gentlemen:

        In connection with the above-referenced transaction, and in consideration of the mutual
promises set forth herein, the Seller and The Bank of New York (the "Bailee") hereby agree to
the terms of this bailee letter (the "Bailee Agreement") as follows:

1.      On such dates agreed upon by the Purchaser and the Seller (each, a "Delivery Date"), the
        Seller shall deliver to the Bailee, as Bailee for the Seller, an asset file (each, an "Asset
        File") for certain mortgage loans and REO properties identified on a schedule to be
        attached hereto as  Schedule 1 with respect to each Delivery Date.  Each such Asset File
        shall contain the items set forth on Exhibit 1 attached hereto.

2.      On each Delivery Date the Bailee shall issue in the name of the Seller, an initial trust
        receipt by facsimile evidencing the Seller's ownership of the related Asset Files in the
        form of Annex  A hereto (the "Initial Trust Receipt"), which shall state that the Bailee
        has received an Asset File for each of the assets listed on the schedule attached to the
        related Initial Trust Receipt.

3.      On each Closing Date, if the Seller has met the conditions precedent set forth in the
        Agreement, the Purchaser shall disburse funds to the Seller pursuant to the related Term
        Sheet for such Closing Date.  Such funds should be distributed to [the Seller] [the Seller's
        warehouse lender] by wire transfer of immediately available funds in accordance with the
        instructions specified below:

**Wire Transfer Instructions**

F-1

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

[Name of Bank]
ABA [_____]
Acct No. [_____]
FCT: [_____]
Attn: [_____]
Ref: [_____]

4.    Upon receipt of written confirmation from the Purchaser that the Purchaser has paid the purchase price as set forth in the above paragraph, the related Asset Files shall be released to the Bailee for the benefit of the Purchaser, and the Bailee shall thereafter be bailee and custodian for the sole benefit of the Purchaser with respect to the related Asset Files. Upon the Bailee's receipt of such written confirmation each Initial Trust Receipt with respect to the related Asset Files thereafter shall automatically be canceled and shall be marked "Canceled" by the Seller and shall be promptly returned to the Bailee.

5.    From the related Delivery Date until the related Closing Date and after a related Return Date (as defined in paragraph 6 below), if any, the Bailee shall maintain continuous custody and control of the related Asset Files as the sole and exclusive Bailee for the Seller.

6.    Upon payment of the purchase price, the Seller hereby releases all security interests, rights, liens or claims of any kind it may have with respect to the related Mortgage Loans.

7.    In the event that the Bailee is notified by the Purchaser in writing that certain of the mortgage loans and REO Properties will not be purchased by the Purchaser, the Bailee shall return the affected Asset Files to the Seller at the Seller's expense within one (1) business day thereof (the "Return Date") in accordance with the Seller's instructions.

8.    The Seller authorizes the Bailee to make the Asset Files available for review to Credit-Based Asset Servicing and Securitization LLC or representatives thereof.

9.    The agreement set forth in this Bailee Agreement may not be modified, amended or altered, except by written instrument, executed by all of the parties hereto.

10.    For the purpose of facilitating the execution of this Bailee Agreement as herein provided and for other purposes, this Bailee Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute and be one and the same instrument.

11.    This Bailee Agreement shall be construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws, except to the extent preempted by federal law.

12.    This Bailee Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Bailee and their respective permitted successors and assigns. The terms "Seller", "Bailee" and "Purchaser" herein shall be deemed to include any such permitted

F-2

successors and assigns thereof.  No party to this Bailee Agreement may assign any or all of its rights and obligations hereunder without the consent of the other party.

13. Capitalized terms used herein and not otherwise defined shall have the meanings assigned in the Agreement.

14. This Bailee Agreement shall supersede any previous bailee agreements executed with respect to the attached assets.

Very truly yours,

_____,
as Seller

By: _____

Name: _____
Title: _____

ACCEPTED AND AGREED:

THE BANK OF NEW YORK
as Bailee

By: _____
Name: _____
Title: _____

F-3

EXHIBIT 1

CONTENTS OF ASSET FILE

1.  The original Mortgage Note, bearing all intervening endorsements, endorsed, "Pay to the order of _____, without recourse" and signed in the name of Seller by an authorized officer or by facsimile signature. In the event that the Mortgage Loan was acquired by Seller in a merger, the signature must be in the following form: "[Seller], successor by merger to name of predecessor]"; and in the event that the Mortgage Loan was acquired or originated by Seller while doing business under another name, the signature must be in the following form: "[Seller], formerly known as [previous name]" or in lieu thereof, a lost note affidavit with indemnification with a copy of the lost Mortgage Note attached thereto, in a form acceptable to Purchaser.

2.  Except as provided below and for each Mortgage Loan that is not a MERS Loan, either: (i) the original recorded Mortgage with recording information thereon, together with a certified true copy of the original power-of-attorney showing the recording information thereon if the Mortgage was executed by an attorney-in-fact; (ii) a certified true copy of the Mortgage and of the power-of-attorney (if applicable) the originals of which have been transmitted for recording, until such time as the originals are returned by the public recording office and in the case of each MERS Loan, the original Mortgage, noting the presence of the MIN of the Loan and either language indicating that the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon; or (iii) a copy of the Mortgage certified by the public recording office in those instances where the public recording office retains the original or the original is lost.

3.  In the case of each Mortgage Loan that is not a MERS Loan, the original individual assignment of Mortgage for each Mortgage Loan, in blank, in form and substance acceptable for recording but not recorded; provided, however, that certain recording information will not be available if, as of the Closing Date, Seller has not received the related recorded Mortgage from the recorder's office. In the event that the Mortgage Loan was acquired by Seller in a merger, the assignment must be by "[Seller], successor by merger, to [name of predecessor]"; and in the event the Mortgage Loan was acquired or originated by Seller while doing business under another name, the assignment must be by "Seller, formerly known as [previous name]."

4.  Original or copy of the policy of title insurance (or, if such policy has not yet been issued by the insurer, the preliminary title report).

5.  Originals of all intervening assignments, if any, with evidence of recording thereon, or certified true copies with evidence that the originals have been transmitted for recording until such time as the originals are returned by the public recording office, or a copy of each such assignment certified by the public recording office if such office retains the original, or if such original is lost.

F-4

6.      Originals or certified copies of all assumption, modification, consolidation or extension
        agreements, if any.

F-5

ANNEX A

INITIAL TRUST RECEIPT

[Date]

[Seller]
[Address]
Attention: _____

     Re:   Bailee Agreement dated _____ __, 200__ (the "Bailee Agreement")
             between _____ (the "Seller") and The Bank of New York
             (the "Bailee")

Ladies and Gentlemen:

In accordance with the provisions of Paragraph 2 of the above-referenced Bailee Agreement, the undersigned, as the Bailee, hereby confirms that as to each asset described in the schedule attached hereto as Schedule 1, it has determined that it has received an Asset File.

The Bailee hereby confirms that it is holding each Asset File as agent and Bailee for the exclusive use and benefit of the Seller pursuant to the terms of the Bailee Agreement.

This Initial Trust Receipt is not negotiable except by the Seller (or its successor and assigns).

All initially capitalized terms used herein shall have the meanings ascribed to them in the above-referenced Bailee Agreement.

THE BANK OF NEW YORK

By: _____
Name:
Title:

F-6

SCHEDULE I

MORTGAGE LOAN SCHEDULE

F-7

EXHIBIT G

SERVICING TRANSFER INSTRUCTIONS

---

| | | | |
|---|---|---|---|
| **Date:** | [Initial Closing Date] | **Subject:** | [Seller] |
| **To:** | [Seller's Servicer contact | **From:** | **Tom Hruska** |

This memo confirms the following list of items required to complete the servicing transfer on each transfer date pursuant to the Master Asset Purchase Agreement, dated as of March 1, 2005, between Credit-Based Asset Servicing and Securitization LLC and Gateway Funding Diversified Mortgage Services, LP.

I.    CONVERSION DATA

Conversion data can be supplied in 3 formats:

A.    Manual conversion

1.    Provide a "master file data record" for each loan (accompanied by a listing of all your code definitions).
2.    Provide a trial balance containing all the loans.   Provide for both preliminary and final data.
3.    Preliminary data should be provided within 24 hours after each servicer acceptance date.
4.    Final data should be provided within 24 hours after each servicing transfer date.

B.    Electronic conversion

1.    If it is determined that this type of conversion is advantageous to both parties the format (Microsoft Excel) will be furnished.
2.    Preliminary data should be provided within 2 days after each servicer acceptance date.
3.    Final data should be provided within 2 days after servicing transfer date.
4.    A trial balance must be provided for both preliminary and final.

C.    Tape to Tape conversion

1.    If it is determined that this type of conversion is advantageous to both parties the details will be furnished.
2.    Preliminary tape should be provided within 24 hours after each servicer accpetance date.
3.    Final data tape should be provided within 24 hours after transfer date.
4.    A trial balance must be provided for both preliminary and final.

II.    HOMEOWNER NOTIFICATION

G-8

A.  The mortgagor notification (good-bye letter) must be mailed at least 15 days prior to the transfer date. A copy of your good-bye letter must be faxed to the Loan Transfer Dept. (fax number 713-561-8248) for approval prior to mailing.

B.  Electronic file or hard copies of your mortgagor notification letters should be provided to LLS within 5 days after servicing transfer date.

C.  INFORMATION FOR NOTIFICATION LETTERS

| | |
|---|---|
| Hours of operation: | 8:00 am to 7:00 pm (CST) |
| Customer Service Toll Free Number: | (800) 247-9727 |
| Correspondence Address: | Litton Loan Servicing LP |
| | 4828 Loop Central Drive |
| | Houston, Texas 77081-2226 |
| Payment Address: | Litton Loan Servicing LP |
| | P.O. Box 4387 |
| | Houston, Texas 77210-4387 |

III.  HAZARD / FLOOD INSURANCE

A.  The Hazard / Flood insurance policies should be in separate files identified with your loan number.

B.  Please request a change to the mortgagee clause as follows:

>    Litton Loan Servicing LP
>    Its Successors or Assigns
>    P.O. Box 4354
>    Houston, TX 77210-4354

C.  Copies of the mortgagee clause change requests should be provided to LLS.

D.  Any unpaid policies, expiration notices, cancellation notices, loans with expired policies should be properly identified, sorted and marked for special handling.

E.  Individual loan insurance records showing payee (name and address), due dates, frequency of payment, next due date, last paid date and last paid amount should be provided in electronic format.

F.  Provide a list of loans under your "force place coverage" program. Will the coverage on individual loans remain in effect until expiration or be canceled at time of the transfer?

G.  Insurance loss drafts should provide all documentation on the current status.

G-9

IV.   FHA LOANS

    A.   Provide a listing including the following items on FHA Loans with a monthly premium.

        1.   Loan number
        2.   FHA case number
        3.   Anniversary date
        4.   Annual premium
        5.   Monthly amount
        6.   Total MIP paid to date
        7.   Next month the premium is due

    B.   Provide a listing including the following items on FHA loans that the full premium was paid up front.

        1.   Loan number
        2.   FHA case number
        3.   Insuring date
        4.   Amount of prepaid premium

    C.   Provide a listing of all FHA Uninsured loans.

    D.   Provide a listing of all FHA 235 loans.

    E.   Provide your HUD ID#.

    F.   HUD Form 92080 should be completed with our HUD mortgagee number (72313) and mailed to LLS for signing and forwarding to HUD. Remember, HUD requires notification by tape if more than 15 loans are transferring.

V.   CONVENTIONAL LOANS

    A.   Provide the individual loan PMI certificates

    B.   Provide copies of the notification to the PMI companies requesting a change of servicer to LLS.  Please do not request cancellation of MI coverage.

    C.   Listing of all loans with PMI to include:

        1.   Loan number
        2.   PMI company
        3.   PMI certificate number
        4.   Next due date
        5.   Last amount paid
        6.   Indicate lender or borrower paid
        7.   Percentage of Coverage

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

    D.      Homeowner Protection Act of 1998.

          1.      Loans originated after July 29, 1999: Provide copies of original disclosure notice produced at origination of loan.

          2.      Loans originated prior to July 29, 1999: Provide the annual disclosure notices supplied to borrowers.

    E.      Listing of loans that have Pool Insurance. If loan has Pool Insurance supply name, address and phone number of insurance agency.

    F.      Listing of loans that have Pool Insurance and private mortgage insurance.

## VI.    REAL ESTATE TAXES

    A.      Individual loan tax records showing payee (name and address), due dates, frequency of payment, next due date, last paid date and last paid amount along with tax contract numbers and vendor information should be provided in electronic format.

    B.      Provide copies of any tax service contracts along with the request for a change of servicer to LLS under the following vendor numbers (Transamerica-2489, First American-56353, Lereta-65000, Fidelity-2059). We also have tax contracts with other tax services, which you can contact us for more information.

    C.      All property taxes due and payable should be paid prior to the transfer date.

    D.      Provide a listing of any loans with delinquent taxes containing the pertinent information as of the transfer date.

## VII.    OPTIONAL INSURANCE

    A.      Only prepaid optional insurance should be provided to LLS.

    B.      All prepaid optional insurance should include the following information.

          1.      Loan number
          2.      Insurance company
          3.      Type of coverage
          4.      Policy Number
          5.      Coverage Amount
          6.      Policy Effective Date
          7.      Premium Amount
          8.      Expiration Date

    C.      Copies of the master and/or individual policies for the insurance coverage.

    D.      Copies of the notification sent to the insurance companies.

G-11

VIII. INVESTOR REPORTS

    A.    Copy of the final remittance report to the investor including a trial balance as of cut-off date.

    B.    Provide a list of all simple interest loans.

    C.    Provide a list of all loans currently on ACH Draft. The borrower to be notified that their ACH Draft will be discontinued in your good bye letter.

IX.    CORPORATE ADVANCES

    A.    Provide list of all loans with corporate advances.

    B.    Back-up documentation must be supplied for any loan with a corporate advance. The documentation must balance to the advance amount and must be furnished in an electronic format (Excel).

    C.    Back-up documentation must be received at the time of transfer.

X.    MERS DATA

    A.    All MERS loans must be moved to correct ORG ID to coincide with transfer.

    B.    The batch number must be supplied to Litton.

    C.    The MIN number must be supplied for each loan transferred on MERS.

XI.    PAYOFFS

    A.    Provide a list of loans that have prepayment penalty provisions in the mortgage.

    B.    Loan level prepayment penalty information must be provided on any loan with a prepayment penalty. This information should be provided in an electronic file or hard copy.

    C.    Unprocessed payoff funds should be accompanied by a copy of the payoff quotation.

    D.    Information should be furnished on any pending payoff or assumption.

    E.    Information on any incomplete partial release should be provided.

XII.    ADJUSTABLE RATE MORTGAGES / GPM / BUYDOWNS / BALLOONS

    A.    Provide individual loan historical rate and P&I changes.

    B.    ARM provisions for each loan within the portfolio

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

C.  Provide list of ARM Plans and definitions.

D.  Provide a list of loans that are step rate and/or GPM mortgages with status of account.

E.  Provide a list of loans that are buydowns with status of account.

F.  Provide a list of balloon loans, their maturity dates, amortization term and if they have a convertible option.  If a loan has reached its maturity date prior to conversion furnish the current status.

G.  Provide a list of loans that are Servicemember's Civil Relief Act, as amended and copies of their orders.

## XIII.  FORECLOSURES

A.  A list of contact people for the Foreclosure, Claims and Bankruptcy area needs to be provided to Litton.

B.  A listing of loans in foreclosure, sorted by state, including status report on each loan showing the current stages of the foreclosure, the foreclosure referral date and who is holding the original documents. Alltel users please provide For1, For 2 and For3 screens or Foreclosure (Service Release report).  Preliminary report should be provided within 3 days after each servicer acceptance date and a final report at the time of the transfer.

C.  Name and address listing of foreclosure attorneys/ Preliminary report should be provided within 3 days after each servicer acceptance date.

D.  Listing of any loans pending a Refunding to the Va., HUD Assignment, approved Dil, Presale or Partial Claim/ Preliminary report should be provided within 3 days after each servicer acceptance date and a final report at the time of the transfer.

E.  Listing of any loan currently in litigation and a report to be provided at time of transfer.

F.  Listing of loans with escrow advances due to delinquency, include breakdown with bills and ledgers attached and reconciled (90, 60, 30) / Report to be provided at time of transfer.

G.  Report of delinquent loans 90 days or older that are not active in foreclosure and or bankruptcy; list date of breach letter and provide copies of breach letter for our file.

H.  Vendor invoices to be paid up to the transfer date.

I.  Report of any loans on a stipulation or payment agreement and a copy of the agreement to be included in the file.

[TPW: NYLEGAL:1 1558.20] 17999-00000 01/14/2005 01:50 PM

J.     The name of the beneficiary they are using for foreclosures.

K.     Files for foreclosures, bankruptcies, claims, breached loans, repayment plans and active loss mitigation accounts must be sorted and identified separately by marking the front of the file or boxing separately.

L.     Trailing correspondence should be sent weekly with the exception of checks or money orders which should be forwarded daily.

M.     Foreclosure files should be sent to the following address:

> Litton Loan Servicing LP
> ATTN: THERESA ALLEN
> 4828 Loop Central Drive
> Houston, TX 77081

## XIV.   BANKRUPTCY

A.     Preliminary listing of loans active in bankruptcy, sorted by state, including the following information.  (a) Type of Chapter filed (b) Date Bankruptcy filed (c) Case Number.  Alltel users please provide BNK1 or Bankruptcy Service Release report. This report should be forwarded within 3 days after deal closing and a final provided on the transfer date.

B.     Listing showing names and address of the debtor's attorney, Seller's attorney and Bankruptcy Trustee.  A preliminary report should be provided within 3 days after each servicer acceptance date and a final provided on the date of the transfer.

C.     Listing of pending relief of stays.

D.     Loan level listing of all loans with agreed orders or stipulation agreements with the current status on each of the cases.

E.     Listing of loans with escrow advances due to bankruptcy. Include breakdown with bill and ledgers attached and reconciled (90, 60, 30 days).

F.     Copies of letters to bankruptcy attorney advising of the transfer.

G.     List of any cramdowns.

H.     Files should be sorted and clearly marked for special handling.

I.     Files should have the status shown on the front of each file and status screen prints included in each file.

J.     Provide a status report that includes attorney's name and phone number, chapter, case number, BK billing date, POC date, prepetition due date, post petition due date and motion status if filed as of the transfer date.

G-14

K.    Bankruptcy files should be sent to the following address:

Litton Loan Servicing LP
ATTN: THERESA ALLEN
4828 Loop Central Drive
Houston, TX 77081

## XV.    LOSS MITIGATION

A.    Short Sale

1.    Recent Property Valuation
2.    Sales Contract
3.    HUD-1 Settlement Statement, estimated
4.    Realtor/Broker contact information
5.    Borrower financials
6.    Borrower hardship letter
7.    Approval letter (if approved and not closed prior to servicing transfer)

B.    Modification: A preliminary report should be provided within 3 days after each servicer acceptance date and the final at servicing transfer date.

1.    Recent Property Valuation
2.    Title Search
3.    Modification Agreement or terms of Modification
4.    Document/Title co. contact information
5.    Borrower financials
6.    Borrower hardship letter
7.    Identification of any funds collected in conjunction with modification.

C.    Deed-in-Lieu of Foreclosure

1.    Recent Property Valuation
2.    Title Search
3.    D-I-L Agreement
4.    Document/Title co. contact information
5.    Borrower financials
6.    Borrower hardship letter

D.    Partial-Claims

1.    Borrower financials
2.    Borrower hardship letter
3.    HUD Insurance Certificate
4.    Identify prior partial claim filings if applicable

G-15

XVI.  OTHER

A.  Provide current year's loan history to the transfer date plus the four prior calendar year's loan histories accompanied by an explanation of your transaction codes. History should be provided in an electronic file or hard copy. A preliminary report should be forwarded within 3 days after each servicer acceptance date and the final within 2 days after servicing transfer date.

B.  Provide copies of the last two-escrow analysis with an explanation of your analysis method (cushion, etc.).

C.  Provide the currently active collection records and pertinent information on delinquent loans along with FICO scores, BPO values, extension data and payment plan data. A preliminary report should be forwarded within 3 days after each servicer acceptance date and the final at servicing transfer date. This information should be provided in an electronic file or hard copy.

D.  Your check for the escrow balances matching the cut-off trial balance.

E.  Your check for any unapplied funds and an indication as to how each unapplied payment should be applied.

F.  Listing of the first lien holder (containing company, address and loan number), if the loan being transferred is a second lien.

G.  Loan payments and/or payoff funds received after the cut-off should be endorsed to Litton Loan Servicing LP and forwarded by overnight service to the following address within twenty-four hours, properly identified with your loan number.

> Litton Loan Servicing LP
> ATTN: Cashiering Department
> 4828 Loop Central Drive
> Houston, TX 77081

H.  Please ship the entire loan file (hard, microfiche or imaged) and all documents to LLS to be received by the transfer date. Provide electronic inventory ledger with servicing files to identify loans within each box. Any information such as preliminary trial balances, master file data records, default information, previous year's ledger histories, etc. should be furnished as early as possible prior to the transfer date. Any file sent to LLS that we will not be servicing will be returned via uninsured regular mail unless LLS is supplied with shipping instructions and method of payment.

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

All servicing files should be sent to:

Litton Loan Servicing LP
Attn:  Records Management Department
4828 Loop Central Drive
Houston, TX 77081

I.    All reports such as trial balances, master file data records, default information, histories, etc. should be sent to :

Litton Loan Servicing LP
Attn:  Loan Transfer
4828 Loop Central Drive
Houston, TX 77081

Remember it is your responsibility to furnish all required IRS reporting statements on these loans for the current year up to the transfer date both to the mortgagors and to the appropriate government agencies.

G-17

Your cooperation in expediting this transfer is appreciated. Should you or any member of your staff have any questions concerning this transfer, please feel free to call me or the appropriate individual listed below at 1-800-247-9727.

| Contact | Department | Extension |
|---|---|---|
| Helen Gavin | ARM's | 8967 |
| Lynn Lindsey | Cash Management | 8921 |
| Tom Hruska | Conversion Manager | 8928 |
| Theresa Allen | Foreclosure/Bankruptcy | 8427 |
| Cheryl Fielder | Insurance | 8868 |
| Yolanda O'Meara | Investor Accounting | 8929 |
| Lesa Flynt | Investor Accounting | 8913 |
| Debbie Thayer | Payoffs | 8880 |
| Janice McClure | Senior Vice President | 8801 |
| Bob Tompkins | Servicing Manager | 8959 |
| Kathy Nelson | Tax | 8881 |

G-18

<u>EXHIBIT H</u>

<u>FORM OF SELLER'S OFFICER'S CERTIFICATE</u>

I, _____, hereby certify that I am the duly elected _____ of GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, LP, a Pennsylvania limited partnership (the "Seller"), and further certify, on behalf of the Seller as follows:

1.      Attached hereto as Attachment I is a true and correct copy of the [Certificate of Incorporation and by-laws][Certificate of limited partnership and limited partnership agreement] of the Seller as are in full force and effect on the date hereof.

2.      No proceedings looking toward merger, liquidation, dissolution or bankruptcy of the Seller are pending or contemplated.

3.      Each person who, as an officer or attorney-in-fact of the Seller, signed (a) the Master Asset Purchase Agreement (the "Purchase Agreement"), dated as of March 1, 2005, between the Seller and Credit-Based Asset Servicing and Securitization LLC (the "Purchaser"); (b) the Term Sheet, dated _____ 200__, between the Seller and the Purchaser (the "Term Sheet"); and (c) any other document delivered prior hereto or on the date hereof in connection with the sale of the Mortgage Loans in accordance with the Purchase Agreement and the Term Sheet was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact, and the signatures of such persons appearing on such documents are their genuine signatures.

4.      Attached hereto as Attachment II is a true and correct copy of the resolutions duly adopted by the board of directors of the Seller on _____, 200__ or the standing resolutions of the Seller (the "Resolutions") with respect to the authorization and approval of the sale of the Mortgage Loans or the sale of mortgage loans generally; said Resolutions have not been amended, modified, annulled or revoked and are in full force and effect on the date hereof.

5.      Attached hereto as Attachment III is a Certificate of Good Standing of the Seller dated _____, 200__. No event has occurred since _____, 200__ which has affected the good standing of the Seller under the laws of the State of _____.

6.      All of the representations and warranties of the Seller contained in Section 5 of the Purchase Agreement were true and correct in all material respects as of the date of the Purchase Agreement and are true and correct in all material respects as of the date hereof.

7.      The Seller has performed all of its duties and has satisfied all the material conditions on its part to be performed or satisfied prior to the related Closing Date pursuant to the Purchase Agreement and the related Term Sheet.

All capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Purchase Agreement.

H-1

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Seller.

Dated: _____

    [Seal]

                              GATEWAY     FUNDING     DIVERSIFIED MORTGAGE SERVICES, LP (Seller)


                              By: _____
                              Name:
                              Title:    [Vice President]

I, _____, Secretary of the Seller, hereby certify that _____ is the duly elected, qualified and acting Vice President of the Seller and that the signature appearing above is genuine.

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated:_____

    [Seal]

                              GATEWAY     FUNDING     DIVERSIFIED MORTGAGE SERVICES, LP (Seller)


                              By: _____
                              Name:
                              Title:    [Assistant] Secretary

H-2

ADDENDUM 1

REO PROPERTIES

With respect to each REO Property, the Agreement shall be deemed to be amended as follows:

1.       The following paragraph shall be inserted immediately following Section 3(c):

"(d).    As provided below Seller shall pay all expenses and costs incurred with respect to the Assets including utilities, real estate taxes, street vault taxes, ad valorem personal property taxes on the basis of the fiscal year for which assessed, any real estate transfer taxes, sales taxes or similar taxes or charges in connection with the transfer of the Assets to Purchaser, amounts prepaid or payable pursuant to the management, brokerage, insurance, service, supply, security, maintenance or similar contracts, and cooperative maintenance charges or other fees and common charges and condominium fees and charges affecting any condominium unit that give rise to a lien thereon prior to the right of Seller or any other similar expenses in connection with the servicing of the Assets.  Seller shall pay such costs with respect to the Assets if due and payable prior to the related Cut-off Date, and those costs which are attributable to costs incurred from and after the related Cut-off Date through the day prior to the related Transfer Date, inclusive, irrespective of when such costs shall become due and payable.  Such costs shall include all taxes or other transfer costs incurred in connection with the transfer of the REO Properties.  Within sixty (60) days following the related Transfer Date, Purchaser will provide Seller with an itemized schedule of such costs and expenses as outlined in this Section 3(d)."

2.       The following paragraphs shall be inserted immediately following Section 5(b) and current Sections 5(c), 5(d), 5(e) and 5(f) shall be renumbered 5(d), 5(e), 5(f) and 5(g), respectively and all references to such section shall be deemed to be amended:

"(c)     Seller represents and warrants to, and covenants with, Purchaser with respect to each real property (including all improvements and fixtures thereon acquired by Seller through foreclosure sale or by deed in lieu of foreclosure or otherwise (an "REO Property")) as of the related Closing Date:

        (i)      The information set forth in the Asset Schedule is complete, true and correct;

        (ii)     Seller is the sole owner and holder of the REO Property, its title is not subject to any right of redemption on the part of any prior owner and has the full right to transfer the REO Property, and the REO Property is free and clear of any lien or encumbrance other than (A) liens for real estate taxes not yet due and payable, (B) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of the related security instrument, such exceptions appearing of record being acceptable to mortgage lending institutions generally, and (C) other matters to which like properties are commonly subject

H-3

which do not, individually or in the aggregate, materially interfere with the use, enjoyment or marketability of the REO Property;

(iii)  Seller has good and marketable title to the REO Property with full right to transfer and sell the REO Property to Purchaser. The Deed is genuine, and constitutes the legal, valid and binding conveyance of the REO Property in fee simple to Purchaser or its designee;

(iv)  All buildings or other improvements upon the REO Property are insured by a generally acceptable insurer against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the REO Property is located pursuant to insurance policies. If the REO Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available) a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect. All individual insurance policies contain a standard insured party clause naming Seller and its successors and assigns as insured party, and all premiums thereon have been paid. The hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of Purchaser upon the consummation of the transactions contemplated by this Agreement. Seller has not engaged in, and has no knowledge of any subservicer's having engaged in, any act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for herein, or the validity and binding effect of either, including, without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by Seller;

(v)  All real property taxes including supplemental or other taxes, if any, governmental assessments, insurance premiums, water, sewer and municipal charges, condominium charges and assessments, leasehold payments or ground rents which previously became due and owing have been paid by Seller and all such amounts which accrue following the related Closing Date will have been paid on or prior to the related Transfer Date;

(vi)  Seller has not received any written notice that there exists a violation of any local, state or federal environmental law, rule or regulation with respect to the REO Property;

H-4

(vii)    All parties which have had any interest in the REO Property, whether as owner, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the REO Property is located, and (2) organized under the laws of such state, or (3) qualified to do business in such state, or (4) federal savings and loan associations or national banks having principal offices in such state, or (5) not doing business in such state;

(viii)   The Deed and any other documents required to be delivered by Seller under this Agreement have been delivered to Purchaser. Seller is in possession of a complete, true and accurate Asset File, except for such documents the originals of which have been delivered to Purchaser. The Deed is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the REO Property is located;

(ix)    Seller has received no notice of any proceeding pending or threatened for the total or partial condemnation of the REO Property.   The REO Property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado, vandalism, natural disaster or other casualty so as to affect adversely the value of the REO Property or the use for which the premises were intended.  The REO Property is free from any and all toxic or hazardous substances and there exists no violation of any local, state or federal environmental law, rule or regulation;

(x)    (1) There is no condition affecting any REO Property (x) relating to lead paint, radon, asbestos or other hazardous materials, (y) requiring remediation of any condition or (z) relating to a claim which could impose liability upon, diminish rights of or otherwise adversely affect Purchaser, (2) Seller prior to the Closing Date has delivered to Purchaser a Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards for the REO Properties in the form of Exhibit I attached hereto and incorporated by reference. Purchaser acknowledges such action and waives the opportunity to conduct risk assessment;

(xi)    Each eviction proceeding relating to an REO Property has been properly commenced and Seller is not aware of any valid defense or counterclaim by anyone with respect thereto.  The REO Property has been serviced and maintained in compliance with all applicable laws and regulations;

H-5

    (xii)    Seller will deliver a valid trustee's sale guaranty from a reputable title insurance company with respect to the REO Property, if same is customarily provided in the related jurisdiction;

    (xiii)    There has been no violation of any law or regulation or breach of any contractual obligation contained in any agreement included in the Asset File, by Seller or its predecessors, in connection with the management of the REO Property;

    (xiv)    The REO Property is neither a cooperative nor a condotel unit, except to the extent the purchase of same has been approved in writing by Purchaser;

    (xv)    There is no illegal activity being conducted on the REO Property which could serve as the basis for a claim or prosecution of any action or proceeding seeking to impose civil or criminal liability on Purchaser as the owner;

    (xvi)    Solely with respect to REO Properties which are condominium units, Seller is not a "sponsor" or a nominee of a "sponsor" under any plan of condominium organization affecting the unit and the ownership and sale of any condominium unit will not violate any federal, state or local law or regulation regarding condominiums or require registration, qualification or similar action under such law or regulation;

    (xvii)    Seller has not performed any work on the REO Property which could give rise to the filing of a mechanics' or materialmen's lien or liens in the nature thereof;

    (xviii)  Seller has provided Purchaser with a copy of each listing agreement with any real estate broker with respect to the REO Property. Each such listing agreement may be terminated without any cost or expense to Purchaser;

    (xix)    There are no existing lease agreements with any tenant with respect to the REO Property which are not terminable upon thirty (30) days' notice to the tenant. There are no existing lease agreements with any tenant with respect to the REO Property; and

    (xx)    Seller has not accepted or executed any contract of sale with respect to the REO Property."

3.      The following sentence shall be inserted immediately following Section 5(f):

"In connection with any repurchase of an REO Property hereunder by Seller, Purchaser shall deliver to Seller all portions of the Asset File with respect to such REO Property previously

H-6

delivered to Purchaser and any additional documents related thereto in Purchaser's or its designee's possession, and each document therein which was assigned to Purchaser as required by this Agreement, shall be assigned to Seller in the same manner as provided herein."

4.      The following clause shall be inserted immediately following Subsection 6(a)(xi):

"(xii)  with respect to any REO Property, a Disclosure of Information on Lead-Based Paint and Lead Hazards for REO Properties, in the form of Exhibit I attached hereto."

5.      Section 6(b) shall be deleted and replaced with the following:

"(b)    The Closing Documents for the Assets to be purchased on each subsequent Closing Date shall consist of each of the items specified in Subsection (a)(iii) through and including Subsection (a)(xii) above."

6.      The following provisions shall be inserted immediately following Section 8(q):

"(r)    REO Properties.  On or prior to the related Transfer Date, with respect to each REO Property, Seller shall terminate, or at the election of Purchaser in writing at least five (5) business days prior to the related Transfer Date with respect to any or all of the following, and as applicable, assign and transfer to Purchaser, (i) all property management agreements and (ii) all brokerage listing agreements (together with the property management agreements, the "REO Agreements").  In no event shall  Purchaser be liable for any costs or expenses (A) associated with the termination of the REO Agreements, (B) arising from or related to the REO Agreements if such REO Agreements are to be terminated by Seller in accordance with this Section arising from or related to the REO Agreements for any period prior to the related Transfer Date, if such REO Agreements are to be assigned by Seller to Purchaser in accordance with this Section.  In addition to the foregoing, on or prior to the related Transfer Date, Seller shall deliver a written notice to all tenants of any REO Properties (if applicable) of the sale of the REO Property and the assignment of rents and leases to Purchaser, which notice shall include an address provided by Purchaser to which the tenants shall remit any payments due under such leases following the related Transfer Date.

(s)    Inspection, Eviction and Management of REO Property. (i) Seller shall advise Purchaser prior to the related Closing Date as to whether or not any eviction proceeding has been commenced by Seller with respect to any REO Property.  Purchaser and Seller agree to cooperate and use their best efforts, within sixty (60) days after the related Closing Date, to (A) notify the Clerk of the Court, and all counsel of record in each such proceeding of the transfer of the REO Property from Seller to Purchaser, (B) file pleadings to relieve Seller's counsel of record from further responsibility in such proceeding (unless said counsel has agreed, upon Purchaser's request, to represent Purchaser in said proceeding at Purchaser's expense), and (C) remove Seller as a party in such proceeding and substitute Purchaser as the real party-in-interest, and change the caption thereof accordingly; provided, however, that if the substitution of Purchaser as the real party-in-interest would delay the proceeding, with Seller's consent, which shall not be unreasonably withheld, Purchaser shall not be obligated to make such substitution.  In connection therewith, after the related Closing Date, Purchaser shall have the sole responsibility to determine the appropriate direction and strategy for such proceeding.  If Purchaser fails to use

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

its best efforts to comply with the above requirements, Seller, upon prior written notice to Purchaser, may on Purchaser's behalf complete any of the actions specified in subparagraphs (A), (B) and (C) above. Purchaser acknowledges that its failure to comply with the provisions of this paragraph may affect Purchaser's rights in any such proceeding, including, without limitation, any dismissal with prejudice or the running of any statute of limitations if any such proceeding is dismissed. On or as soon as possible after the related Closing Date, Seller shall provide Purchaser with a list of those attorneys currently pursuing eviction proceedings on Seller's behalf with respect to any REO Property."

(ii)     Prior to the related Closing Date, Seller, at its expense, shall: winterize the pipes and plumbing by drainage or any other appropriate action, secure the REO Property to prevent unauthorized access, cause to have removed any snow from public walkways on or about the REO Property, secure any swimming pool, as necessary, and correct any known condition that might post a safety hazard or cause or allow immediate damage to such REO Property. In addition, Seller shall utilize such standards relating to the maintenance of such REO Property including winterization as are customarily employed by prudent servicers in the area in which the REO Property is located."

7.     The following requirements shall be inserted into <u>Exhibit A-1</u> immediately following Item 7:

"In addition, with respect to each REO Property the Asset File shall include each of the following items:

1.     Original deed in blank, which deed shall be in form and substance acceptable for recording but not recorded.

2.     Copy of the trustee's deed, sheriff's deed or referee's deed (or equivalent document), with evidence of recording thereon, evidencing the ownership of the related REO Property by Seller (Seller may deliver a copy of the trustee's deed without recording information thereon if the original is being recorded and Seller delivers a copy with recording information thereon promptly after receipt), including originals of certificates of foreclosure, and such additional documents as are customary in the jurisdiction in which the REO Property is located evidencing ownership of such REO Property by Seller.

3.     Special warranty deed (or equivalent document) from Seller to Purchaser or its designee containing at a minimum a covenant by Seller that it has not done anything by act or omission to encumber the related REO Property, consistent with the representations and remedies herein, transferring fee simple title to the applicable REO Property to Purchaser or its designee.

4.     Original policy of title insurance procured by Seller, if any, upon foreclosure of the related mortgage loan, properly endorsed, accompanied by an updated title report with respect to the REO Property.

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

5.    Current title report or commitment, showing that Seller is the sole owner of the REO Property and that the REO Property is free and clear of all liens, claims and encumbrances or subject only to such encumbrances as are acceptable to institutional lenders generally.

6.    Valid trustee's sale guaranty for such REO Property, if customarily obtained in the related jurisdiction."

8.    The following requirements shall be inserted into <u>Exhibit A-2</u> immediately following Item 18:

"With respect to each REO Property, the Servicing File shall include each of the following items:

1.    Original or copy of the most recent appraisal.

2.    Original or copy of the preliminary title report.

3.    Note, security instrument and any related loan documents.

4.    Foreclosure, bankruptcy or insurance files with respect to the REO Property.

5.    All builders' warranties and building and other inspection reports with respect to the REO Property.

6.    Originals of all leases and assignment of rents and leases affecting the REO Property, if applicable.

7.    Recent fuel reading for the REO Property.

8.    Copy of the most recent real estate tax bill or bills.

9.    All notices which Seller has received from tenants and other occupants of the REO Property.

10.   All notices and other correspondence regarding tenancies and compliance with governmental requirements.

11.   Copy of any certificate of occupancy and any other permits relating to the REO Property.

12.   Keys to such REO Property, if applicable.

13.   Copies of all Mortgage Loan documents.

14.   All assignment, deed, conveyancing and other documents shall be consistent with standard conveyancing practice and law, as applicable to the type of REO Property in question. The documents with respect to the conveyance of any condominium unit from Seller to Purchaser shall conform to the requirements of

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

the condominium association. Seller, at its expense, shall prepare all deeds and other documents customarily required in accordance with applicable laws and customs with respect to the transfer of the REO Properties to Purchaser.

15.  Any other documents that Seller has maintained with respect to servicing for each REO Property."

9.  The following exhibit shall be inserted immediately following <u>EXHIBIT H</u>:

"EXHIBIT I

Disclosure of Information on Lead-Based Paint and Lead Based Paint Hazards

**DISCLOSURE CERTIFICATION**

This Disclosure Certification is made in connection with the transaction contemplated pursuant to that certain Asset Purchase Agreement (the "<u>Agreement</u>") dated as of _____ ___, 200__ between _____ (the "<u>Seller</u>") and Credit-Based Asset Servicing and Securitization LLC (the "<u>Purchaser</u>"). Capitalized terms used and not defined herein shall have the respective meanings assigned to them in the Agreement.

1.  Pursuant to 40 C.F.R. Part 745 and 24 C.F.R. Part 35 (the "<u>Regulations</u>"), every purchaser of any interest in fee title to residential real property on which a residential dwelling was built prior to 1978 ("<u>Residential Property</u>") must be notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired mental ability. Lead poisoning also poses a partial risk to pregnant women. The seller of any Residential Property is required to provide the buyer with any information on lead-based paint hazards from risk assessment or inspection in the seller's possession and notify the buyer of any known lead-based paint hazards. An assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

2.  To the extent that any of the REO Property is Residential Property Seller hereby acknowledges that:

> (a) it has no actual knowledge of lead-based paint and/or lead-based paint hazards, as defined in the Regulations, being present in the REO Property; and

> (b) it has no reports or records pertaining to lead-based paint and/or lead-based paint hazards, as defined in the Regulations, related to the REO Property other than as set forth in the Asset Files.

3.  Purchaser hereby acknowledges and confirms that it has:

> (a) received and reviewed all information contained in the Asset Files;

H-10

(b) received and reviewed the pamphlet "Protect Your Family from Lead in Your Home"; and

(c) waived the opportunity to conduct a risk assessment or inspection for the presence of lead paint and/or lead-based paint hazards in connection with the purchase of the REO Property.

IN WITNESS WHEREOF, Seller and Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

[SELLER]


By: _____
Name:
Title:



CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC, as Purchaser


By: _____
Name:
Title:

H-11

ADDENDUM 2

FHA AND VA MORTGAGE LOANS

With respect to each FHA or VA Mortgage Loan, the Agreement shall be deemed to be amended as follows:

1.      The following definitions shall apply with respect to the FHA and VA Mortgage Loans:

"FHA": The Federal Housing Administration, an agency within the United States Department of Housing and Urban Development, or any successor thereto and including the Federal Housing Commissioner and the Secretary of Housing and Urban Development where appropriate under the FHA Regulations.

"FHA Approved Mortgagee": Those institutions which are approved by FHA to act as servicer and mortgagee of record pursuant to FHA Regulations.

"FHA Insurance Contract" or "FHA Insurance": The contractual obligation of FHA respecting the insurance of an FHA Loan pursuant to the National Housing Act, as amended.

"FHA Loan": A Mortgage Loan which is the subject of an FHA Insurance Contract as evidenced by a Mortgage Insurance Certificate.

"FHA Regulations": Regulations promulgated by HUD under the National Housing Act, codified in 24 Code of Federal Regulations, and other HUD issuances relating to FHA Loans, including the related Handbooks, Circulars, Notices and Mortgagee Letters.

"GNMA": The Government National Mortgage Association, or any successor thereto.

"Insurance Agreements": Collectively, the FHA Insurance Contracts and the VA Guaranty Agreements.

"Loan Guaranty Certificate": The certificate evidencing a VA Guaranty Agreement.

"Mortgage Insurance Certificate": The certificate evidencing an FHA Insurance Contract.

"VA": The U.S. Department of Veterans Affairs, an agency of the United States of America, or any successor thereto.

"VA Approved Lender": Those lenders which are approved by the VA to act as a lender in connection with the origination of VA Loans.

"VA Guaranty Agreement": The obligation of the United States to pay a specific percentage of a Mortgage Loan (subject to a maximum amount) upon default of the mortgagor pursuant to the Serviceman's Readjustment Act, as amended.

H-12

"VA Loan": A Mortgage Loan which is the subject of a VA Guaranty Agreement as evidenced by a Loan Guaranty Certificate.

"VA Regulations": Regulations promulgated by the Veterans Administration pursuant to the Serviceman's Readjustment Act, as amended, codified in 36 Code of Federal Regulations, and other VA issuances relating to VA Loans, including related Handbooks, Circulars and Notices.

2.    The following paragraph shall be added to Section 3 of the Agreement immediately following Subsection 3(a):

"Notwithstanding the foregoing, on the related Closing Date, the Purchase Price for the FHA and VA Mortgage Loans shall be an amount equal to (i) the amount specified on Schedule Two attached to the Term Sheet plus (ii) any accrued interest at the Mortgage Note interest rate less fifty (50) basis points through the related Closing Date."

3.    The following paragraph shall be added to the end of Subsection 3(b):

"With respect to the FHA and VA Mortgage Loans on the related Transfer Date, Purchaser shall reimburse Seller for escrow advances (as described in Section 8(d)) which are fully claimable under the related Insurance Agreement and which are outstanding on the related Transfer Date. With respect to corporate advances, Purchaser shall reimburse Seller within thirty (30) days of receipt from Seller of loan level information with respect to the corporate advances (as described in Section 8(e)) if such corporate advances are fully claimable under the related Insurance Agreement, are outstanding on the related Transfer Date and are deemed to be reimbursable by Purchaser. Any payments required to be made by Seller pursuant to this Section 3(b) shall be made by wire transfer of immediately available funds."

4.    The following representation and warranty shall be added to Section 5(a) of the Agreement immediately following Subsection 5(a)(xi):

"(xii)  Seller is an approved seller/servicer of mortgage loans for GNMA, FHA and VA and has the facilities, procedures and experienced personnel necessary for the servicing of mortgage loans of the same type as the Mortgage Loans in accordance with FHA and VA policies and regulations. Seller is in good standing to sell and service mortgage loans for GNMA, FHA and VA, and no event has occurred which would make Seller unable to comply with GNMA, FHA or VA eligibility requirements or which would require notification to any of GNMA, FHA or VA."

5.    Representations and warranties (iv), (v), (x), (xiii) and (xviii) in Section 5(b) of the Agreement shall be deleted and replaced with the following representations and warranties:

"(iv)  The terms of the note or other evidence of indebtedness of the related mortgagor secured by the Mortgaged Property (in each case, the "Mortgage Note") and the mortgage or other instrument creating a lien on the Mortgaged Property (in each case, a "Mortgage") have not been impaired, waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the Mortgage, the substance of which waiver, alteration or modification is reflected on the Asset Schedule and has been approved by the primary mortgage guaranty insurer, if any, and the title

H-13

insurer, to the extent required by the related policy and with respect to the FHA and VA Mortgage Loans have been approved by the FHA, to the extent required by the FHA Insurance Contract, or the VA, to the extent of the VA Guaranty Agreement; no instrument of waiver, alteration or modification has been executed, and no mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the primary mortgage guaranty insurer, if any, and the title insurer, to the extent required by the related policy and with respect to an FHA Loan, the FHA to the extent required by the FHA Insurance Contract or FHA Regulations, or with respect to a VA Loan, the VA to the extent of the VA Guaranty Agreement, and which assumption agreement is part of the Asset File or the Servicing File and the terms of which are reflected in the Asset Schedule;

(v)    The servicing and collection practices with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage servicing business, as conducted by prudent mortgage lending institutions which service mortgage loans of the same type in the jurisdiction in which the Mortgaged Property is located, and the Mortgage Loans have been serviced in accordance with all FHA and VA policies and regulations. The Mortgage Loan was originated and has been serviced in a manner such that the Mortgage Loan will be eligible for the maximum amount of insurance made available by the FHA or VA, as the case may be, without any right of offset, counterclaim or defense by the FHA or VA, as the case may be;

(x)    The related Mortgage is a valid and enforceable first or second lien on the Mortgaged Property, which Mortgaged Property is free and clear of all encumbrances and liens having priority over the lien of the Mortgage except for (A) liens for real estate taxes and special assessments not yet due and payable, (B) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of the Mortgage, such exceptions appearing of record being acceptable to mortgage lending institutions generally and to the FHA or VA, as the case may be, or specifically reflected in the appraisal made in connection with the origination of the related Mortgage Loan, (C) other matters to which like properties are commonly subject which do not, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property and which will not in any way prevent realization of the full benefits of the FHA Insurance Contract or VA Guaranty Agreement and (D) with respect to any second lien Mortgage Loan, the lien of the related first mortgage loan secured by the Mortgaged Property. The Mortgage Note and the Mortgage have not been assigned or pledged, other than to lenders whose liens will be released prior to the Closing Date or simultaneously with Purchaser's purchase hereunder, on the Closing Date, pursuant to a duly executed Security Release in the form of Exhibit C (the "Security Release Certification"). Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, existing and enforceable first or second lien and first or second priority security interest on the property described therein. As of the Closing Date, Seller is the sole owner thereof and has full right to transfer and sell the Mortgage Loans to Purchaser free and clear of any lien or encumbrance or other security interest;

(xiii)    The Mortgage Loan is covered by an American Land Title Association lender's title insurance policy or other generally acceptable form of policy of insurance acceptable to

H-14

he

prudent mortgage lending institutions and with respect to FHA Loans and VA Loans, the FHA or VA, as the case may be, issued by a title insurer acceptable to prudent mortgage lending institutions and qualified to do business in the jurisdiction where the Mortgaged Property is located (or by an attorney's abstract and opinion of title if the Mortgaged Property is located in Iowa), and with respect to FHA Loans and VA Loans, the FHA or the VA, as the case may be, insuring Seller, its successors and assigns, as to the first or second priority lien of the Mortgage, as indicated on the Asset Schedule, in the original principal amount of the Mortgage Loan and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage interest rate and monthly payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress to and from the Mortgaged Property, and against encroachments by or upon the Mortgaged Property or any interest therein. Seller is the sole insured of lender's title insurance policy, and lender's title insurance policy is in full force and effect. No claims have been made under the lender's title insurance policy, and neither Seller nor any prior holder has done, by act or omission, anything which would impair the coverage of the lender's title insurance policy;

(xviii) The Mortgaged Property securing the Mortgage Loan is insured by an insurer generally acceptable to prudent mortgage lending institutions and with respect to FHA Loans and VA Loans acceptable to the FHA or VA, as the case may be, against loss by fire and such hazards, including but not limited to damage by windstorm, as are covered under a standard extended coverage endorsement and such other hazards as are customary in the area where the Mortgaged Property is located; if the Mortgaged Property is a condominium unit, it is included under the coverage afforded by a blanket policy for the project; all such insurance policies contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee and all premiums thereon have been paid; if the Mortgaged Property is in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available) a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect which policy conforms to the requirements of FNMA and FHLMC. All such insurance policies contain a standard mortgagee clause naming Seller, its successor and assigns as mortgagee and all premiums thereon have been paid. The Mortgage obligates the mortgagor thereunder to maintain all such insurance at the mortgagor's cost and expense, and on the mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at mortgagor's cost and expense and to seek reimbursement therefor from the mortgagor;"

6.     The following representations and warranties shall be added to Section 5(b) following Subsection 5(b)(lviii):

"(lix)   All parties which have had any interest in an FHA Loan or a VA Loan, whether as mortgagee or assignee, are (or, during the period in which they held and disposed of such interest, were) an FHA Approved Mortgagee or VA Approved Lender;

(lx)    The Mortgage is either guaranteed by the VA to the maximum extent permitted by law or is fully insured by the FHA and all necessary steps have been taken to make and keep such guaranty or insurance valid, binding and enforceable and the applicable Insurance

H-15

Agreement is the binding, valid and enforceable obligation of the FHA or VA, as the case may be, to the full extent thereof, without surcharge, set-off or defense;

(lxi)    All principal and interest advances, corporate advances and escrows purchased by Purchaser are recoverable to the maximum extent provided under FHA and VA policies and regulations or by law under the related Insurance Agreement for the related FHA Loan or VA Loan;

(lxii)    In the case of an FHA Loan, no claim for insurance benefits, full or partial, has been filed with respect to such Mortgage Loan and, in the case of a VA Loan, no claim for guarantee has been filed;

(lxiii)    With respect to each FHA Loan for which three or more monthly installments have not been paid on the related Mortgage, such Mortgage has undergone or is presently undergoing "loss mitigation" pursuant to FHA Mortgagee Letter 96-61;

(lxiv)    No Mortgage Loan is (a) an active subsidy loan originated under the 203K program (24 C.F.R. 203.50), a Section 235 subsidy loan (24 C.F.R. 235), or a graduated loan under Section 245 (24 C.F.R. 203.45 and 24 C.F.R. 203.436), (b) an advance claim loan, or (c) a VA Vendee loan; and

(lxv)    Neither Seller, its servicer, nor any prior holder or servicer of the Mortgage Loans has engaged in any action or inaction which would result in the curtailment of a payment (or nonpayment thereof) by the FHA or the VA."

7.    The following paragraph shall be added to Section 5 immediately following Subsection 5(f):

"Notwithstanding the foregoing, with respect to any repurchased FHA Loan and VA Loan, the interest paid on such repurchased loan pursuant to the penultimate sentence of Subsection 5(e) shall be equal to the rate of interest borne on such FHA Loan or VA Loan minus fifty (50) basis points. In addition, in lieu of the foregoing repurchase obligation, Purchaser shall have the right to file a claim for insurance benefits or guarantee with respect to an FHA Loan or VA Loan, as the case may be. In the event Purchaser incurs a loss as a result of a curtailment of a payment (or nonpayment thereof) by the FHA or the VA due to the breach of one or more of the representations and warranties in Section 5(b) Seller shall pay to Purchaser an amount equal to such curtailment. Such payment shall be made by Seller within three (3) business days of Purchaser's delivery to it of an invoice detailing such amount."

8.    The following paragraph shall be inserted immediately following Section 19:

"In addition, (i) in the event that the VA fails to establish a maximum bid price in connection with the foreclosure of any VA Loan (a "VA No-Bid Loan") within two years following the related Closing Date, Seller agrees to pay to Purchaser an amount equal to the difference between (A) the unpaid principal balance of such VA Loan as of the date of the disposition of such VA Loan plus accrued and unpaid interest thereon plus any advances thereon and (B) the sum of the guaranteed amount paid by the VA plus the projected proceeds of the foreclosure sale

[TPW: NYLEGAL:11558.20] 17999-00000 01/14/2005 01:50 PM

as specified by the VA in their bidding instructions, or (ii) in the event the VA provides a no-bid advice with respect to a VA Loan within two years following the related Closing Date, Seller agrees to pay to Purchaser the "Buydown Amount" (as defined below) for such VA Loan upon Seller's receipt of a copy of the letter sent by the VA which sets forth the VA's no-bid advice. The "Buydown Amount" shall mean the amount of indebtedness outstanding on a VA Loan that Purchaser may waive or satisfy on such VA Loan in order to obtain a specified foreclosure bid amount from the VA. Purchaser shall have the sole option of proceeding pursuant to subclause (i) or (ii) above, and Seller shall make a payment pursuant to subclause (i) or (ii) above, respectively, within three (3) business days of Purchaser's delivery to Seller of an invoice determining such amount to be paid by Seller."

9.      The following paragraph shall be inserted in <u>Exhibit A-2</u> immediately following item 18:

"19.    All other documents reasonably necessary to service and document the FHA and VA Loans in accordance with FHA and VA requirements, including evidence of the FHA case number with respect to the FHA Loans."

10.     The following headings shall be inserted in <u>Schedule One</u> of <u>Exhibit B</u> as two new columns on the Asset Schedule:

    "FHA Section Number"

    "FHA Loan or VA Loan Case Number"

H-17

# EXHIBIT 3

TERM SHEET

This TERM SHEET (the "Term Sheet") dated July 8, 2005 between GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, LP, a Pennsylvania limited partnership corporation located at 300 Welsh Road Drive, Building 5, Horsham, Pennsylvania 19044 (the "Seller") and Credit-Based Asset Servicing and Securitization LLC, a Delaware limited liability company, located at 335 Madison Avenue - 19th Floor, New York, New York 10017 (the "Purchaser") is made pursuant to the terms and conditions of that certain Master Asset Purchase Agreement (the "Agreement") dated as of March 1, 2005, between the Seller and the Purchaser, the provisions of which are incorporated herein as if set forth in full herein, as such terms and conditions may be modified or supplemented hereby. Capitalized terms used in this Term Sheet and not otherwise defined herein shall have the meanings specified in the Agreement.

Definitions

For purposes of the Assets identified on Schedule One hereto to be sold pursuant to the Agreement, the following terms shall have the following meanings:

| | |
|---|---|
| Closing Date: | July 8, 2005, or such other date as the parties may agree. |
| Cut-off Date: | July 6, 2005 |
| Principal Balance: | $5,926,226.03 |
| Transfer Date: | July 31, 2005 |
| Purchase Price: | With respect to each Asset, the amount specified on Schedule Two hereto. |

Additional Terms and Conditions

The Mortgage Loans identified on Schedule Four hereto do not have tax service contracts.

On the Closing Date, the Purchaser has purchased certain mortgage loans with document deficiencies (the "Affected Mortgage Loans") as listed on Schedule Three-A and Schedule Three-B attached hereto. In consideration of the Purchaser's agreement to purchase the Affected Mortgage Loans, the Purchaser and the Seller hereby agree as follows:

1.     The Seller shall deliver to the Purchaser or its designee, Litton Loan Servicing LP, 4828 Loop Central Drive, Houston, Texas 77081, Attention: Lela Derouen, within (a) 60 days from the Closing Date with respect to any Mortgage Loan originated more than 6 months prior to the Closing Date (the "Seasoned Loan Cure Date") all necessary documentation to cure the document deficiencies as outlined on Schedule Three-A and (b) 120 days from the Closing Date with respect to any Mortgage Loan originated within 6 months of the Closing Date (the "Newly Originated Loan Cure Date", together with the Seasoned Loan Cure Date, the "Cure Date") all necessary documentation to cure the document deficiencies as outlined on Schedule Three-B. In the event that the Seller fails to deliver all necessary documentation to cure the deficiency with respect to any Affected Mortgage Loan by the applicable Cure Date, the Seller will repurchase such Affected Mortgage

Loan at the Repurchase Price specified in the Agreement. The repurchase will occur no later than one (1) business day from the applicable Cure Date.

2. Contemporaneously with any repurchase of an Affected Mortgage Loan, the Purchaser will reconvey such Mortgage Loan to the Seller by delivering to the Seller or the Seller's designee the collateral documents delivered to the Purchaser with proper assignment and endorsement documentation.

3. The rights granted hereunder shall be cumulative with the rights provided under the Agreement and shall inure to the benefit of the Purchaser and its successors and assigns. This Term Sheet shall survive the closing of the transaction and shall not be merged with the Agreement or any other agreement, and shall be independently enforceable by the parties hereto. For the purpose of facilitating the execution of this Term Sheet, and for other purposes, this Term Sheet may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

7-8-05

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed to this Term Sheet by their respective duly authorized officers as of the date first above written.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, LP

By: _____
Name: Timothy M Sheehan
Title: Senior Vice President

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC

By: _____
Name:
Title:

7-8-05

# EXHIBIT 4

TERM SHEET

This TERM SHEET (the "Term Sheet") dated March 24, 2006 between GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, LP, a Pennsylvania limited partnership corporation located at 300 Welsh Road Drive, Building 5, Horsham, Pennsylvania 19044 (the "Seller") and Credit-Based Asset Servicing and Securitization LLC, a Delaware limited liability company, located at 335 Madison Avenue - 19th Floor, New York, New York 10017 (the "Purchaser") is made pursuant to the terms and conditions of that certain Master Asset Purchase Agreement (the "Agreement") dated as of March 1, 2005, between the Seller and the Purchaser, the provisions of which are incorporated herein as if set forth in full herein, as such terms and conditions may be modified or supplemented hereby. Capitalized terms used in this Term Sheet and not otherwise defined herein shall have the meanings specified in the Agreement.

<u>Definitions</u>

For purposes of the Assets identified on <u>Schedule One</u> hereto to be sold pursuant to the Agreement, the following terms shall have the following meanings:

| | |
|---|---|
| <u>Closing Date</u>: | March 24, 2006, or such other date as the parties may agree. |
| <u>Cut-off Date</u>: | March 22, 2006 |
| <u>Principal Balance</u>: | $3,333,052.40 |
| <u>Transfer Date</u>: | April 13, 2006 |
| <u>Purchase Price</u>: | With respect to each Asset, the amount specified on <u>Schedule Two</u> hereto. |

<u>Additional Terms and Conditions</u>

A       Section 5(b)(xxiii) of the Agreement is hereby deleted in its entirety and replaced with the following:

> "To the extent required under applicable law, each originator and subsequent mortgagee or servicer of the Mortgage Loan complied with all licensing requirements and was authorized to transact and do business in the jurisdiction in which the related Mortgaged Property is located at all times when it held or serviced the Mortgage Loan. Each Mortgage Loan and, if any, the related prepayment penalty complied in all material respects with any and all requirements of federal, state or local laws or regulations, including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, predatory lending, abusive lending, fair credit reporting, unfair collection practice, equal credit opportunity, fair housing and disclosure laws and regulations, applicable to the solicitation, origination, collection and servicing of such Mortgage Loan; and any obligations of the holder of the Mortgage Note, Mortgage and other loan documents have been complied with in all

material respects and the consummation of the transaction contemplated hereby will not involve the violation of any such laws or regulations, and Seller shall maintain in its possession, available for inspection of Purchaser or its designee, and shall deliver to Purchaser or its designee, upon two business days' request, evidence of compliance with such requirements;"

B    Section 5(b)(xxix) of the Agreement is hereby deleted in its entirety and replaced with the following:

"No Mortgage Loan is subject to the provisions of the Homeownership and Equity Protection Act of 1994 as amended or is considered a "high cost," "predatory" or "abusive" loan (or a similarly designated loan using different terminology) under any state, county or municipal laws or ordinances, including without limitation, the provisions of the Georgia Fair Lending Act, New York Banking Law, Section 6-1, the New Jersey Home Ownership Security Act of 2002 (the "NJ Act") or any other statute or regulation providing "assignee" or "originator" liability to holders of such mortgage loans;"

C    Section 5(b)(xxxiii) of the Agreement is hereby amended by adding the following sentence as the fourth sentence therein:

"No Balloon Mortgage Loan has an original stated maturity of less than seven (7) years.""

D    Section 5(b)(xliii) of the Agreement is hereby deleted in its entirety and replaced with the following:

"No predatory or deceptive lending practices, including but not limited to, the extension of credit to the mortgagor without regard for the mortgagor's ability to repay the Mortgage Loan and the extension of credit to the mortgagor which has no apparent benefit to the mortgagor, were employed by the originator of the Mortgage Loan in connection with the origination of the Mortgage Loan. With respect to each Mortgage Loan, (i) no mortgagor was required to purchase any single premium credit life insurance policy (e.g., life, mortgage, disability, accident, unemployment, or health insurance product) or debt cancellation agreement as a condition of obtaining the extension of credit; (b) no mortgagor obtained a prepaid single premium credit insurance policy (e.g., life, mortgage, disability, accident, unemployment or health insurance product) in connection with the origination of the Mortgage Loan; and (c) no proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies or debt cancellation agreements as part of the origination of, or as a condition to closing, such Mortgage Loan;"

E    Section 5(b)(lvii) of the Agreement is hereby deleted in its entirety and replaced with the following:

"No Mortgage Loan that was originated on or after August 1, 2004 is subject to mandatory arbitration to resolve any dispute arising out of or relating to in any way the Mortgage Loan transaction;"

F    Section 5(b)(lviii) of the Agreement is hereby deleted in its entirety and replaced with the following:

"With respect to any Mortgage Loan that contains a provision permitting imposition of a premium upon a prepayment prior to maturity: (a) prior to the Mortgage Loan's origination, the mortgagor agreed to such premium in exchange for a monetary benefit, including but not limited to a rate or fee reduction; (b) prior to the Mortgage Loan's origination, the mortgagor was offered the option of obtaining a mortgage loan that did not require payment of such a premium; (c) the prepayment premium is adequately disclosed to the mortgagor in the Mortgage Loan documents pursuant to applicable state and federal law; and (d) no Mortgage Loan originated on or after October 1, 2002 will impose a prepayment premium for a term in excess of three years and any Mortgage Loans originated prior to such date will not impose prepayment penalties in excess of five years; in each case unless the Mortgage Loan was modified to reduce the prepayment period to no more than three years from the date of the Mortgage Note and the mortgagor was notified in writing of such reduction in prepayment period;"

G    Section 5(b) of the Agreement is hereby amended by adding the following after subpart (lviii):

"(lix)      The Seller has fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its mortgagor credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis with respect to each Mortgage Loan;

"(lx)      With respect to the Mortgage Loans, no mortgagor was encouraged or required to select a mortgage loan product offered by the Mortgage Loan's originator which is a higher cost product designed for less creditworthy mortgagors, unless at the time of the Mortgage Loan's origination, such mortgagor did not qualify taking into account credit history and debt to income ratios for a lower cost credit product then offered by the Mortgage Loan's originator or any affiliate of the Mortgage Loan's originator. If, at the time of loan application, the mortgagor may have qualified for a lower cost credit product then offered by any mortgage lending affiliate of the Mortgage Loan's originator, the Mortgage Loan's originator referred the mortgagor's application to such affiliate for underwriting consideration;

"(lxi)      The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the mortgagor's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the mortgagor's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting

methodology confirmed that at the time of origination (application/approval) the
mortgagor had the reasonable ability to make timely payments on the Mortgage Loan;

"(lxii)       No mortgagor under a Mortgage Loan was charged "points and fees" in an
amount greater than (a) $1,000 or (b) 5% of the principal amount of such Mortgage Loan,
whichever is greater.  For purposes of this representation, "points and fees" (x) include
origination, underwriting, broker and finder's fees and charges that the lender imposed as
a condition of making the Mortgage Loan, whether they are paid to the lender or a third
party; and (y) exclude bona fide discount points, fees paid for actual services rendered in
connection with the origination of the Mortgage (such as attorneys' fees, notaries fees
and fees paid for property appraisals, credit reports, surveys, title examinations and
extracts, flood and tax certifications, and home inspections); the cost of mortgage
insurance or credit-risk price adjustments; the costs of title, hazard, and flood insurance
policies; state and local transfer taxes or fees; escrow deposits for the future payment of
taxes and insurance premiums; and other miscellaneous fees and charges that, in total, do
not exceed 0.25 percent of the loan amount;

"(lxiii)      All points, fees and charges (including finance charges), whether or not
financed, assessed, collected or to be collected in connection with the origination and
servicing of each Mortgage Loan, have been disclosed in writing to the mortgagor in
accordance with applicable state and federal law and regulation.  Except in the case of a
Mortgage Loan in an original principal amount of less than $60,000 which would have
resulted in an unprofitable origination, no mortgagor was charged "points and fees"
(whether or not financed) in an amount greater than 5% of the principal amount of such
Mortgage Loan, such 5% limitation is calculated in accordance with FNMA's anti-
predatory lending requirements as set forth in the FNMA selling guide;

"(lxiv)      With respect to any Mortgage Loans that are on manufactured housing,
such housing will be the principal residence of the mortgagor upon origination of the
Mortgage Loan;

"(lxv)       With respect to any subordinate lien Mortgage Loan, such lien is on a one-
to four-family residence that is (or will be) the principal residence of the mortgagor upon
origination of such subordinate lien Mortgage Loan;

"(lxvi)      Each Mortgage Loan is in compliance with the anti predatory lending
eligibility for purchase requirements of FNMA's selling guide;

"(lxvii)     No Mortgage Loan is a high cost loan or a covered loan, as applicable (as
such terms are defined in Standard & Poor's LEVELS Version 5.6 Glossary Revised,
Appendix E); and

"(lxviii)    With respect to the Mortgage Loans, the Mortgage Loan's originator
offered the mortgagor mortgage loan products offered by such Mortgage Loan's
originator, or any affiliate of such Mortgage Loan's originator, for which the mortgagor
qualified."

H    Section 5(e) of the Agreement is hereby amended by adding the following immediately after the last sentence:

"Notwithstanding anything to the contrary contained herein, it is understood by the parties hereto that a breach of the representations and warranties made in Sections 5(b)(xxiii), (xxix), (xliii), (xlix), (lvii), (lviii), (lix), (lx), (lxi), (lxii), (lxiii), (lxiv), (lxv) or (lxviii), will be deemed to materially and adversely affect the value of the related Mortgage Loan or the interest of Purchaser therein."

I    The Agreement is hereby amended by adding the following Section to the Agreement:

"SECTION 26. Compliance with Regulation AB. In connection with any sale or transfer of some or all of the Mortgage Loans by Purchaser to a trust to be formed as part of a publicly issued or privately placed mortgage-backed securities transaction (a "Pass-Through Transfer"), Seller shall cooperate fully with Purchaser as follows:

   (i)    to deliver to Purchaser within five (5) business days after request by Purchaser, the information with respect to Seller (as originator) and each other originator of the Mortgage Loans as required under Item 1110(a) and (b) of Regulation AB (as defined below) as reasonably requested by Purchaser. If requested by Purchaser, this will include information about the applicable credit-granting or underwriting criteria;

   (ii)   to deliver to Purchaser within five (5) business days after request by Purchaser, static pool information as required under Item 1105(a)(1) - (3) and (c) of Regulation AB and in scope and format as reasonably requested by Purchaser with respect to mortgage loans that were originated by Seller (as originator) and each other originator of the Mortgage Loans and which are similar to the Mortgage Loans;

   (iii)  to deliver to Purchaser within five (5) business days after request by Purchaser, (i) information regarding any legal proceedings pending (or known to be contemplated) against Seller (as originator and as servicer) and each other originator of the Mortgage Loans as required by Item 1117 of Regulation AB as reasonably requested by Purchaser (ii) information regarding affiliations with respect to Seller (as originator and as servicer) and each other originator of the Mortgage Loans as required by Item 1119(a) of Regulation AB as reasonably requested by Purchaser, and (iii) information regarding relationships and transactions with respect to Seller (as originator and as servicer) and each other originator of the Mortgage Loans as required by Item 1119(b) and (c) of Regulation AB as reasonably requested by Purchaser; and

   (iv)   to deliver to Purchaser and to any person designated by Purchaser, at Seller's expense, such statements and audit letters of reputable, certified public accountants pertaining to information provided by Seller pursuant to clause (ii) above, and pursuant to clause (i) above to the extent

constituting financial information, and any opinions of counsel as shall be reasonably requested by Purchaser.

Promptly following notice or discovery of a material error in the static pool information provided pursuant to (ii) above (including an omission to include therein information required to be provided pursuant (ii) above), Seller shall provide corrected static pool information to Purchaser in the same format in which such static pool information was previously provided to Purchaser by Seller.

Seller shall indemnify Purchaser and any sponsor, depositor, surety bond provider, issuing entity and underwriter in connection with a Pass-Through Transfer for any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from any untrue statement or alleged untrue statement of any material fact contained in the information provided by Seller pursuant to clauses (i), (ii) and (iii) of this Section 26 (the "Seller Information") or the omission or the alleged omission to state in the Seller Information a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances in which they are made, not misleading.

"Regulation AB" as used in this Agreement shall be defined as Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as amended from time to time."

J    The Mortgage Loans identified on <u>Schedule Four</u> hereto do not have tax service contracts.

K    On the Closing Date, the Purchaser has purchased certain mortgage loans with document deficiencies (the "Affected Mortgage Loans") as listed on <u>Schedule Three-A</u> and <u>Schedule Three-B</u> attached hereto.  In consideration of the Purchaser's agreement to purchase the Affected Mortgage Loans, the Purchaser and the Seller hereby agree as follows:

1.    The Seller shall deliver to the Purchaser or its designee, Litton Loan Servicing LP, 4828 Loop Central Drive, Houston, Texas 77081, Attention: Lela Derouen, within (a) 60 days from the Closing Date with respect to any Mortgage Loan originated more than 6 months prior to the Closing Date (the "Seasoned Loan Cure Date") all necessary documentation to cure the document deficiencies as outlined on <u>Schedule Three-A</u> and (b) 120 days from the Closing Date with respect to any Mortgage Loan originated within 6 months of the Closing Date (the "Newly Originated Loan Cure Date", together with the Seasoned Loan Cure Date, the "Cure Date") all necessary documentation to cure the document deficiencies as outlined on <u>Schedule Three-B</u>.  In the event that the Seller fails to deliver all necessary documentation to cure the deficiency with respect to any Affected Mortgage Loan by the applicable Cure Date, the Seller will repurchase such Affected Mortgage Loan at the Repurchase Price specified in the Agreement.  The

repurchase will occur no later than one (1) business day from the applicable Cure Date.

2.    Contemporaneously with any repurchase of an Affected Mortgage Loan, the Purchaser will reconvey such Mortgage Loan to the Seller by delivering to the Seller or the Seller's designee the collateral documents delivered to the Purchaser with proper assignment and endorsement documentation.

3.    The rights granted hereunder shall be cumulative with the rights provided under the Agreement and shall inure to the benefit of the Purchaser and its successors and assigns. This Term Sheet shall survive the closing of the transaction and shall not be merged with the Agreement or any other agreement, and shall be independently enforceable by the parties hereto. For the purpose of facilitating the execution of this Term Sheet, and for other purposes, this Term Sheet may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed to this Term Sheet by their respective duly authorized officers as of the date first above written.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, LP

By: _____
Name: John P. Moqvin
Title: Vice President

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC

By: _____
Name:
Title:

5. Certification of Release

The Seller named below hereby certifies to Credit-Based Asset Servicing and Securitization LLC that, as of the Date and Time of Sale of the above mentioned Assets to Credit-Based Asset Servicing and Securitization LLC, the security interests in the Assets released by the above named company comprise all security interests relating to or affecting any and all such Assets. The Seller warrants that, as of such time, there are and will be no other security interests affecting any or all of such Assets.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, LP
                    Seller

By:
Name:
Title:

GAT016
3-24-06

.

# EXHIBIT 5

TERM SHEET

This TERM SHEET (the "Term Sheet") dated January 11, 2007 between GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, LP, a Pennsylvania limited partnership corporation located at 300 Welsh Road Drive, Building 5, Horsham, Pennsylvania 19044 (the "Seller") and Credit-Based Asset Servicing and Securitization LLC, a Delaware limited liability company, located at 335 Madison Avenue - 19th Floor, New York, New York 10017 (the "Purchaser") is made pursuant to the terms and conditions of that certain Master Asset Purchase Agreement (the "Agreement") dated as of March 1, 2005, between the Seller and the Purchaser, the provisions of which are incorporated herein as if set forth in full herein, as such terms and conditions may be modified or supplemented hereby. Capitalized terms used in this Term Sheet and not otherwise defined herein shall have the meanings specified in the Agreement.

Definitions

For purposes of the Assets identified on Schedule One hereto to be sold pursuant to the Agreement, the following terms shall have the following meanings:

| | |
|---|---|
| Closing Date: | January 11, 2007, or such other date as the parties may agree. |
| Cut-off Date: | January 9, 2007 |
| Principal Balance: | $5,245,513.88 |
| Transfer Date: | January 31, 2007 |
| Purchase Price: | With respect to each Asset, the amount specified on Schedule Two hereto. The total Purchase Price is $5,145,811.30 The Purchase Price is payable (i) $5,086,642.70 in cash, (ii) by means of the offset of Purchaser's claims in the amount of $9,168.60 arising under the Agreement, relating to the Assets attached hereto on Schedule Six (the "Claims Schedule") and (iii) by means of another offset of $50,000 as set forth in the side letter dated as of January 11, 2006, between the Seller and the Purchaser. |

Additional Terms and Conditions

A    Section 5(b)(xxiii) of the Agreement is hereby deleted in its entirety and replaced with the following:

"To the extent required under applicable law, each originator and subsequent mortgagee or servicer of the Mortgage Loan complied with all licensing requirements and was authorized to transact and do business in the jurisdiction in which the related Mortgaged Property is located at all times when it held or serviced the Mortgage Loan. Each Mortgage Loan and, if any, the related prepayment penalty with any and all requirements of federal, state or local laws or regulations, including, without limitation,

usury, truth-in-lending, real estate settlement procedures, consumer credit protection, predatory lending, abusive lending, fair lending, fair credit reporting, unfair collection practice, equal credit opportunity, fair housing and disclosure laws and regulations, applicable to the solicitation, origination, collection and servicing of such Mortgage Loan; and any obligations of the holder of the Mortgage Note, Mortgage and other loan documents have been complied with in all material respects and the consummation of the transaction contemplated hereby will not involve the violation of any such laws or regulations, and Seller shall maintain in its possession, available for inspection of Purchaser or its designee, and shall deliver to Purchaser or its designee, upon two business days' request, evidence of compliance with such requirements;"

B    Section 5(b)(xxix) of the Agreement is hereby deleted in its entirety and replaced with the following:

"No Mortgage Loan is subject to the provisions of the Homeownership and Equity Protection Act of 1994 ("HOEPA") as amended or has an "annual percentage rate" or "total points and fees" payable by the mortgagor (as each such term is defined under HOEPA) that equal or exceed the applicable thresholds defined under HOEPA (Section 32 of Regulation Z, 12 C.F.R. Section 226.32(a)(1)(i) and (ii)) or is considered a "high cost," "predatory" or "abusive" loan (or a similarly designated loan using different terminology) under any state, county or municipal laws or ordinances, including without limitation, the provisions of the Georgia Fair Lending Act, New York Banking Law, Section 6-1, the New Jersey Home Ownership Security Act of 2002 (the "NJ Act") or any other statute or regulation providing "assignee" or "originator" liability to holders of such mortgage loans;"

C    Section 5(b)(xxxiii) of the Agreement is hereby amended by adding the following sentence as the fourth sentence therein:

"No Balloon Mortgage Loan has an original stated maturity of less than seven (7) years."

D    Section 5(b)(xliii) of the Agreement is hereby deleted in its entirety and replaced with the following:

"No predatory or deceptive lending practices, including but not limited to, the extension of credit to the mortgagor without regard for the mortgagor's ability to repay the Mortgage Loan and the extension of credit to the mortgagor which has no apparent benefit to the mortgagor, were employed by the originator of the Mortgage Loan in connection with the origination of the Mortgage Loan. With respect to each Mortgage Loan, (a) no mortgagor was required to purchase any single premium credit life insurance policy (e.g., life, mortgage, disability, accident, unemployment, or health insurance product) or debt cancellation agreement as a condition of obtaining the extension of credit; (b) no mortgagor obtained a prepaid single premium credit insurance policy (e.g.,

life, mortgage, disability, accident, unemployment, property or health insurance product) or debt cancellation agreement in connection with the origination of the Mortgage Loan; and (c) no proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies (e.g., life, mortgage, disability, accident, unemployment or health insurance product) or debt cancellation agreements as part of the origination of, or as a condition to closing, such Mortgage Loan;"

E    Section 5(b)(lvii) of the Agreement is hereby deleted in its entirety and replaced with the following:

"No Mortgage Loan that was originated on or after August 1, 2004 is subject to mandatory arbitration to resolve any dispute arising out of or relating to in any way the Mortgage Loan transaction;"

F    Section 5(b)(lviii) of the Agreement is hereby deleted in its entirety and replaced with the following:

"With respect to any Mortgage Loan that contains a provision permitting imposition of a penalty upon a prepayment prior to maturity: (a) the Mortgage Loan provides some benefit to the mortgagor (e.g., a rate or fee reduction) in exchange for accepting such prepayment penalty; (b) the Mortgage Loan's originator had a written policy of offering the mortgagor, or requiring third-party brokers to offer the mortgagor, the option of obtaining a mortgage loan that did not require payment of such a penalty; (c) the prepayment penalty was adequately disclosed to the mortgagor in the Mortgage Loan documents pursuant to applicable state and federal law; and (d) no Mortgage Loan originated on or after October 1, 2002 will provide for prepayment penalties for a term in excess of three years and any Mortgage Loans originated prior to such date will not impose prepayment penalties in excess of five years; in each case unless the Mortgage Loan was modified to reduce the prepayment period to no more than three years from the date of the Mortgage Note and the mortgagor was notified in writing of such reduction in prepayment period;"

G    Section 5(b) of the Agreement is hereby amended by adding the following after subpart (lviii):

"(lix)        The Seller has fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its mortgagor credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis with respect to each Mortgage Loan;

"(lx)        With respect to the Mortgage Loans, no mortgagor was encouraged or required to select a mortgage loan product offered by the Mortgage Loan's originator which is a higher cost product designed for less creditworthy mortgagors, unless at the time of the Mortgage Loan's origination, such mortgagor did not qualify taking into account credit history and debt to income ratios for a lower cost credit product then offered by the Mortgage Loan's originator or any affiliate of the Mortgage Loan's

originator. If, at the time of loan application, the mortgagor may have qualified for a lower cost credit product then offered by any mortgage lending affiliate of the Mortgage Loan's originator, the Mortgage Loan's originator referred the mortgagor's application to such affiliate for underwriting consideration;

"(lxi)    The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the mortgagor's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely solely on the extent of the mortgagor's equity in the collateral as the principal determining factor in approving such credit extension. The methodology employed objective criteria such as the mortgagor's income, assets and liabilities, to the proposed mortgage payment and, based on such methodology, the Mortgage Loan's originator made a reasonable determination that at the time of origination the mortgagor had the ability to make timely payments on the Mortgage Loan;

"(lxii)    No mortgagor under a Mortgage Loan was charged "points and fees" (whether or not financed) in an amount greater than (a) $1,000 or (b) 5% of the principal amount of such Mortgage Loan, whichever is greater.    For purposes of this representation, "points and fees" (x) include origination, underwriting, broker and finder's fees and charges that the lender imposed as a condition of making the Mortgage Loan, whether they are paid to the lender or a third party; and (y) exclude bona fide discount points, fees paid for actual services rendered in connection with the origination of the Mortgage (such as attorneys' fees, notaries fees and fees paid for property appraisals, credit reports, surveys, title examinations and extracts, flood and tax certifications, and home inspections); the cost of mortgage insurance or credit-risk price adjustments; the costs of title, hazard, and flood insurance policies; state and local transfer taxes or fees; escrow deposits for the future payment of taxes and insurance premiums; and other miscellaneous fees and charges which miscellaneous fees and charges, in total, do not exceed 0.25 percent of the loan amount;

"(lxiii)    All points, fees and charges (including finance charges), whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each Mortgage Loan, have been disclosed in writing to the mortgagor in accordance with applicable state and federal law and regulation;

"(lxiv)    With respect to any Mortgage Loans that are on manufactured housing, upon the origination of each such Mortgage Loan the manufactured housing unit either (i) will be the principal residence of the mortgagor , or (ii) will be classified as real property under applicable state law;

"(lxv)    With respect to any subordinate lien Mortgage Loan, such lien is on a one-to four-family residence that is (or will be) the principal residence of the mortgagor upon origination of such subordinate lien Mortgage Loan;

"(lxvi)    Each Mortgage Loan is in compliance with the anti predatory lending eligibility for purchase requirements of FNMA's selling guide;

GAT019

"(lxvii)    No Mortgage Loan is a high cost loan or a covered loan, as applicable (as such terms are defined in Standard & Poor's LEVELS Version 5.7 Glossary Revised, Appendix E); and

"(lxviii)    With respect to each Mortgage Loan, the mortgagor was not encouraged or required to select a mortgage loan product offered by the Mortgage Loan's originator which is a higher cost product designed for less creditworthy mortgagors, taking into account such facts as, without limitation, the mortgage loan's requirements and the mortgagor's credit history, income, assets and liabilities. For a mortgagor who sought financing through a Mortgage Loan originator's higher-priced subprime lending channel, the mortgagor was directed towards or offered the Mortgage Loan originator's standard mortgage line if the mortgagor is able to qualify for one of the standard products."

H    Section 5(e) of the Agreement is hereby amended by adding the following immediately after the last sentence:

"Notwithstanding anything to the contrary contained herein, it is understood by the parties hereto that a breach of the representations and warranties made in Sections 5(b)(xxiii), (xxix), (xliii), (xlix), (lvii), (lviii), (lix), (lx), (lxi), (lxii), (lxiii), (lxiv), (lxv) or (lxviii), will be deemed to materially and adversely affect the value of the related Mortgage Loan or the interest of Purchaser therein."

I    Section 17 of the Agreement is hereby deleted in its entirety and replaced with the following:

"Section 17.    <u>Further Assurances; Financial Statements</u>.  Each party to this Agreement agrees to execute and deliver such instruments and take such actions as the other party may, from time to time, reasonably request to effect the purpose and carry out the terms of this Agreement.  In addition, Seller shall provide to Purchaser, no later than forty five (45) days following the end of each calendar quarter, audited financial statements (or unaudited, if audited financial statements are not available) of the Seller.

J    The Agreement is hereby amended by adding the following Section to the Agreement:

"SECTION 26.    <u>Compliance with Regulation AB</u>.  The Purchaser and the Seller acknowledge and agree that the purpose of Section 26 of this Agreement is to facilitate compliance by the Purchaser and any depositor, as such term is defined in Regulation AB (as defined below), with respect to any Securitization Transaction (as defined below) (the "Depositor") with the provisions of Regulation AB and related rules and regulations of the United States Securities and Exchange Commission (the "Commission").  Although Regulation AB is applicable by its terms only to offerings of asset-backed securities that are registered under the Securities Act of 1933, as amended (the "Securities Act"), the Seller acknowledges that investors in privately offered securities may require that the Purchaser or any Depositor provide comparable disclosure in unregistered offerings.  References in this Agreement to compliance with Regulation AB include provision of comparable disclosure in private offerings.

Neither the Purchaser nor any Depositor shall exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes

GAT019

other than compliance with the Securities Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules and regulations of the Commission thereunder (or the provision in a private offering of disclosure comparable to that required under the Securities Act). The Seller acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the asset-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Purchaser or any Depositor in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. In connection with any Securitization Transaction, the Seller shall cooperate fully with the Purchaser to deliver to the Purchaser (including any of its assignees or designees) and any Depositor, any and all statements, reports, certifications, records and any other information necessary in the good faith determination of the Purchaser or any Depositor to permit the Purchaser or such Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to the Seller, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof (a "Person"), other than a Qualified Correspondent (as defined below), that originated Mortgage Loans acquired by the Seller (the "Third-Party Originator") and the Mortgage Loans, reasonably believed by the Purchaser or any Depositor to be necessary in order to effect such compliance.

The Purchaser (including any of its assignees or designees) shall cooperate with the Seller by providing timely notice of requests for information under these provisions and by reasonably limiting such requests to information required, in the Purchaser's reasonable judgment, to comply with Regulation AB.

"Qualified Correspondent" shall be defined as any Person from which the Seller purchased Mortgage Loans, provided that the following conditions are satisfied: (i) such Mortgage Loans were originated pursuant to an agreement between the Seller and such Person that contemplated that such Person would underwrite mortgage loans from time to time, for sale to the Seller, in accordance with underwriting guidelines designated by the Seller ("Designated Guidelines") or guidelines that do not vary materially from such Designated Guidelines; (ii) such Mortgage Loans were in fact underwritten as described in clause (i) above and were acquired by the Seller within 180 days after origination; (iii) either (x) the Designated Guidelines were, at the time such Mortgage Loans were originated, used by the Seller in origination of mortgage loans of the same type as the Mortgage Loans for the Seller's own account or (y) the Designated Guidelines were, at the time such Mortgage Loans were underwritten, designated by the Seller on a consistent basis for use by lenders in originating mortgage loans to be purchased by the Seller; and (iv) the Seller employed, at the time such Mortgage Loans were acquired by the Seller, pre-purchase or post-purchase quality assurance procedures (which may involve, among other things, review of a sample of mortgage loans purchased during a particular time period or through particular channels) designed to ensure that Persons from which it purchased mortgage loans properly applied the underwriting criteria designated by the Seller.

"Regulation AB" shall be defined as Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg.

1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"Securitization Transaction" shall be defined as any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Subsection 26.02.    Additional Representations and Warranties of the Seller.

(a)    The Seller shall be deemed to represent to the Purchaser and to any Depositor, as of the date on which information is first provided to the Purchaser or any Depositor under Subsection 26.03 that, except as disclosed in writing to the Purchaser or such Depositor prior to such date: (i) there are no material legal or governmental proceedings pending (or known to be contemplated) against the Seller or any Third-Party Originator; and (ii) there are no affiliations, relationships or transactions relating to the Seller or any Third-Party Originator with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AB.

(b)    If so requested by the Purchaser or any Depositor on any date following the date on which information is first provided to the Purchaser or any Depositor under Subsection 26.03, the Seller shall, within five business days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Subsection or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

Subsection 26.03.    Information to Be Provided by the Seller.

In connection with any Securitization Transaction in which the Purchaser reasonably believes that the aggregate outstanding principal amount of the Mortgage Loans may comprise 20% or more of the aggregate principal amount of any group of the mortgage loans in such Securitization Transaction, or in the case of information requested pursuant to Item 1119, may comprise 10% or more, the Seller shall (i) within five business days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or cause each Third-Party Originator to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (a) and (b) of this Subsection, and (ii) as promptly as practicable following notice to or discovery by the Seller, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in paragraph (c) of this Subsection.  The Purchaser acknowledges and agrees that the Seller's obligations under this Section 26 shall be limited to no more than three (3) Securitization Transactions.

GAT019

(a)    If so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding (i) the Seller, as originator of the Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), or (ii) each Third-Party Originator, as is requested for the purpose of compliance with Items 1103(a)(1), 1105, 1110, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

(A)    the originator's form of organization;

(B)    a description of the applicable originator's origination program and how long the originator has been engaged in originating residential mortgage loans, which description shall include a discussion of such originator's experience in originating mortgage loans of a similar type as the Mortgage Loans; information regarding the size and composition of the originator's origination portfolio; and information that may be material, in the good faith judgment of the Purchaser or any Depositor, to an analysis of the performance of the Mortgage Loans, including such originators' credit-granting or underwriting criteria for mortgage loans of similar type(s) as the Mortgage Loans and such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1110(b)(2) of Regulation AB;

(C)    a description of any material legal or governmental proceedings pending (or known to be contemplated) against the Seller and each Third-Party Originator; and

(D)    a description of any affiliation or relationship between the Seller and each Third-Party Originator and any of the following parties to a Securitization Transaction, as such parties are identified to the Seller by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

(i)    the sponsor;
(ii)   the depositor;
(iii)  the issuing entity;
(iv)   any servicer;
(v)    any trustee;
(vi)   any originator;
(vii)  any significant obligor;
(viii) any enhancement or support provider; and
(ix)   any other material transaction party.

(b)    If so requested by the Purchaser or any Depositor, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide) static pool information as described in Item 1105(a)(1)-(3) and 1105(c) of Regulation AB ("Static Pool Information") with respect to the mortgage loans (of a similar type as the Mortgage Loans, as reasonably identified by the Purchaser as provided below) originated by (i) the Seller, if the Seller is an originator of Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), and/or (ii) each Third-Party Originator. Such Static Pool Information shall be prepared by the Seller (or Third-Party Originator) on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(a)(1)-(3) of Regulation AB. To the extent that there is reasonably available to the Seller (or Third-Party Originator) Static Pool Information with respect to more than one mortgage loan type, the Purchaser or any Depositor shall be entitled to specify whether

GAT019

some or all of such information shall be provided pursuant to this paragraph. The content of such Static Pool Information may be in the form customarily provided by the Seller, and need not be customized for the Purchaser or any Depositor. Such Static Pool Information for each vintage origination year or prior securitized pool, as applicable, shall be presented in increments no less frequently than quarterly over the life of the mortgage loans included in the vintage origination year or prior securitized pool. The most recent periodic increment must be as of a date no later than one hundred thirty five (135) days prior to the date of the prospectus or other offering document in which the Static Pool Information is to be included or incorporated by reference. The Static Pool Information shall be provided in an electronic format that provides a permanent record of the information provided, such as a portable document format (pdf) file, or other such electronic format reasonably required by the Purchaser or the Depositor, as applicable.

Promptly following notice or discovery of a material error in Static Pool Information provided pursuant to the immediately preceding paragraph (including an omission to include therein information required to be provided pursuant to such paragraph), the Seller shall provide corrected Static Pool Information to the Purchaser or any Depositor, as applicable, in the same format in which Static Pool Information was previously provided to such party by the Seller.

If so requested by the Purchaser or any Depositor, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide), at the expense of the requesting party (to the extent of any additional incremental expense associated with delivery pursuant to this Agreement), such agreed-upon procedures letters of certified public accountants reasonably acceptable to the Purchaser or Depositor, as applicable, pertaining to Static Pool Information relating to prior securitized pools for securitizations closed on or after January 1, 2006 or, in the case of Static Pool Information with respect to the Seller's or Third-Party Originator's originations or purchases, to calendar months commencing January 1, 2006, as the Purchaser or such Depositor shall reasonably request. Such statements and letters shall be addressed to and be for the benefit of such parties as the Purchaser or such Depositor shall designate, which may include, by way of example, any sponsor, any Depositor and any broker dealer acting as underwriter, placement agent or initial purchaser with respect to a Securitization Transaction. Any such statement or letter may take the form of a standard, generally applicable document accompanied by a reliance letter authorizing reliance by the addressees designated by the Purchaser or such Depositor.

(c)    The Seller shall (or shall cause each Third-Party Originator to) (i) notify the Purchaser and any Depositor in writing of (A) any material litigation or governmental proceedings pending against the Seller or any Third-Party Originator and (B) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Seller or any Third-Party Originator and any of the parties specified in clause (D) of paragraph (a) of this Subsection (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, and (ii) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or relationships.

(d)    Seller shall also deliver to Purchaser and to any Person designated by Purchaser, at Seller's expense, such statements and audit letters of reputable, certified public accountants pertaining to information provided by Seller pursuant to Subsections 26.03(a)(A) and (B) above

GAT019

to the extent constituting financial information, and any opinions of counsel as shall be reasonably requested by Purchaser.

Subsection 26.04.    Indemnification; Remedies.

The Seller shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction; each broker dealer acting as underwriter, placement agent or initial purchaser, each Person who controls any of such parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing and of the Depositor, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i)(A)  any untrue statement of a material fact contained or alleged to be contained in any information, report, certification, accountants' letter or other material provided in written or electronic form under this Section 26 by or on behalf of the Seller, or provided under this Section 26 by or on behalf of any Third-Party Originator (collectively, the "Seller Information"), or (B) the omission or alleged omission to state in the Seller Information a material fact required to be stated in the Seller Information or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, by way of clarification, that clause (B) of this paragraph shall be construed solely by reference to the Seller Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Seller Information or any portion thereof is presented together with or separately from such other information;

(ii)  any failure by the Seller or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Section 26; or

(iii)  any breach by the Seller of a representation or warranty set forth in Subsection 26.02(a) or in a writing furnished pursuant to Subsection 26.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Seller of a representation or warranty in a writing furnished pursuant to Subsection 26.02(b) to the extent made as of a date subsequent to such closing date.

In the case of any failure of performance described in clause (ii) of this Subsection, the Seller shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain

GAT019

the information, report, certification, accountants' letter or other material not delivered as required by the Seller or any Third-Party Originator.

K.    The Mortgage Loans identified on <u>Schedule Four</u> hereto do not have tax service contracts.

L.    Exhibit G of the Agreement is hereby deleted in its entirety and replaced with the Exhibit G set forth as Schedule Five hereto.

M.    On the Closing Date, the Purchaser has purchased certain mortgage loans with document deficiencies (the "Affected Mortgage Loans") as listed on <u>Schedule Three-A</u> and <u>Schedule Three-B</u> attached hereto. In consideration of the Purchaser's agreement to purchase the Affected Mortgage Loans, the Purchaser and the Seller hereby agree as follows:

    1.    The Seller shall deliver to the Purchaser or its designee, Litton Loan Servicing LP, 4828 Loop Central Drive, Houston, Texas 77081, Attention: Lela Derouen, within (a) 60 days from the Closing Date with respect to any Mortgage Loan originated more than 6 months prior to the Closing Date (the "Seasoned Loan Cure Date") all necessary documentation to cure the document deficiencies as outlined on <u>Schedule Three-A</u> and (b) 120 days from the Closing Date with respect to any Mortgage Loan originated within 6 months of the Closing Date (the "Newly Originated Loan Cure Date", together with the Seasoned Loan Cure Date, the "Cure Date") all necessary documentation to cure the document deficiencies as outlined on <u>Schedule Three-B</u>. In the event that the Seller fails to deliver all necessary documentation to cure the deficiency with respect to any Affected Mortgage Loan by the applicable Cure Date, the Seller will repurchase such Affected Mortgage Loan at the Repurchase Price specified in the Agreement. The repurchase will occur no later than one (1) business day from the applicable Cure Date.

    2.    Contemporaneously with any repurchase of an Affected Mortgage Loan, the Purchaser will reconvey such Mortgage Loan to the Seller by delivering to the Seller or the Seller's designee the collateral documents delivered to the Purchaser with proper assignment and endorsement documentation.

    3.    The rights granted hereunder shall be cumulative with the rights provided under the Agreement and shall inure to the benefit of the Purchaser and its successors and assigns. This Term Sheet shall survive the closing of the transaction and shall not be merged with the Agreement or any other agreement, and shall be independently enforceable by the parties hereto. For the purpose of facilitating the execution of this Term Sheet, and for other purposes, this Term Sheet may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

GAT019

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed to this Term Sheet by their respective duly authorized officers as of the date first above written.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, LP


By: _____
Name:
Title:

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC


By: _____
Name:
Title:

GAT019